(70 South. 784)

No. 20134.

ADDINGTON v. TIMES PUB. CO.

(Jan. 10, 1916. Rehearing Denied Feb. 7, 1916.)

*(Syllabus by the Court.)*

1. LIBEL AND SLANDER ☞30 — NEWSPAPER PUBLICATION—INACCURACIES.

A newspaper publication is not false merely because it contains inaccuracies not affecting its purport.

[Ed. Note.—For other cases, see Libel and Slander, Dec. Dig. ☞30.]

2. LIBEL AND SLANDER ☞10 — NEWSPAPER PUBLICATION — CRITICISM OF DETECTIVE — MALICE.

The conduct of a detective performing the duties of a policeman is a legitimate subject of newspaper comment and criticism; and, although such criticism be severe, it does not render the publisher liable in damages, without proof of actual malice, if the publication was made in support of a public contention and in condemnation of what the publisher had good reason to regard as a public wrong.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 41, 91–96; Dec. Dig. ☞10.]

3. LIBEL AND SLANDER ☞10 — NEWSPAPER PUBLICATION—ACTIONABLE WORDS.

As newspaper accounts of police court proceedings and detectives' escapades are not required to be written in a dignified style, it is not slanderous per se for the reporter to call a detective a "fly cop," to characterize his ruthless and unwarranted arrest of a man as "spearing" him, and describe the officer's blunder as "pulling off a bonehead stunt."

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 41, 91–96; Dec. Dig. ☞10.]

Appeal from First Judicial District Court, Parish of Caddo; T. F. Bell, Judge.

Action by J. G. Addington against the Times Publishing Company. From judgment for defendant, plaintiff appeals. Affirmed.

Scheen & Blanchard, of Shreveport, for appellant. Blanchard & Smith, of Shreveport, for appellee.

O'NIELL, J. The plaintiff has appealed from a judgment rejecting his demand for $5,000 damages for an alleged libel. The article published in the defendant's newspaper, the Shreveport Times, and alleged to be false, malicious, and libelous, is as follows:

"Marvelous is Work of Local 'Fly Coppers.'

"J. C. Wallis Arrested Yesterday on False Charges by Detectives.

"Pavlovich Bared the Plot.

"In Signed Statement Local Restaurant Man Declared That His Name Was Used Without Authority in Matter of a Ten Dollar Check—Facts in the Case.

"Evidently smarting under the rebuke administered by District Judge Bell some days ago, when they created a scene in the lobby of the Inn Hotel by arresting J. C. Wallis, of this city, without a warrant. Detectives Addington and Craddock pulled off another bonehead stunt yesterday by raking up a check in the possession of Barney Pavlovich, proprietor of the Cosmopolitan Hotel, signed by Mr. Wallis in the amount of $10 (which check, by the way, was paid the morning after the evening it was drawn), and arrested Mr. Wallis again yesterday morning at the Inn Hotel charging him with obtaining money under false pretenses.

"The vindictive sleuths, quick to hunt the light of publicity for their devotion to the cause, hurriedly placed the matter in the hands of the afternoon paper, but in their haste omitted vital facts.

## "Pavlovich Reveals Scheme.

"The following letter signed by Pavlovich, proprietor of the Cosmopolitan Restaurant, and mailed to the editor of the afternoon paper, bares the whole little scheme of petty revenge on the part of the officers:

"'Editor Shreveport Journal, City—Dear Sir: The article in your paper of the 14th instant relative to the arrest of Mr. Wallis is very erroneous, inasmuch as it puts the undersigned in as a party who had Mr. Wallis arrested. I never preferred any charge against Mr. Wallis, nor have I any cause to; to the contrary, I told the authorities that I did not want Mr. Wallis arrested. Mr. Wallis has always conducted himself in a gentlemanly manner in my place of business and is a good customer of mine, and could get $10 from me without a check or anything else any old time.'

## "Incited by Revenge.

" 'The authorities have used my name without my wishes, and for their own personal revenge, and I demand that you explain this at length. See the affidavit at the city hall and signatures thereto, and then say who preferred the charge. Don't be too hasty. It seems that Mr. Wallis has some recourse in the premises. Yours truly, B. Pavlovich, Proprietor Cosmopolitan Restaurant. Witnesses, Frank Dispenza, Dan Kumarich.'

## "How Case Came up.

"The facts in the case, as explained by Mr. Wallis, are that Pavlovich gave Mr. Wallis $10 on a personal check some time ago late in the evening. The check was drawn on the Continental Bank, and the next morning Mr. Wallis came in and paid the $10. Barney Pavlovich was not in the place at the time, and the employé in charge could not find the check that was left on the night before. A few days afterwards Mrs. Pavlovich running across the check in the papers on the desk, and, not knowing that it had been paid, handed it in for collection. In the meantime Mr. Wallis had transferred his account from the Continental to another local bank. When the check was returned unpaid, Mrs. Pavlovich called her husband's attention to the matter and he informed her that the check had been paid the morning after it had been cashed.

## "Addington Found the Check.

"A day or two ago Addington was in the restaurant and a number of unpaid checks came up for discussion. The old check of Mr. Wallis was run across, and the detective, seeing the chance to spear Wallis again, insisted on taking it away with him. Pavlovich followed the officer from the place to explain, but the detective would pay no attention to him, rushed to police headquarters, and filed an affidavit. Pavlovich then went to the district attorney and explained the matter to him at length.

## "Released on Bond.

"After his arrest yesterday, Wallis was released on bond of $50, signed by S. W. Tullos, proprietor of the Inn Hotel. The charges trumped up against Wallis by the police during the early part of the week, when the spectacular arrest of Wallis was made at the Inn Hotel, against the protests of Mr. Tullos were dismissed by the police Saturday, as was the case against Mr. Tullos, charged with interfering with an officer.

"The detectives will be called on to explain to their newspaper friends how a 'bum steer' was given out, as to who swore out the warrant against Mr. Wallis yesterday, and how the whole thing came about."

The defendant denied that there was any malice in publishing the account of the arrest of J. C. Wallis, and alleged that the only motive of the publication was to inform its readers of the court proceedings, which were matters of public interest; that a thorough investigation was first made, and the account of the arrest of Mr. Wallis was then published in good faith as to its correctness, and that the article was true, except as to a few inaccuracies which did not affect its purport.

The testimony discloses that there was error in the statement that Mr. Addington took the $10 check from the Pavlovich restaurant to the police station for the purpose of making the criminal charge against Mr. Wallis. The accusation came about in this way: Mr. Pavlovich called at police headquarters with a dishonored check for $5, which he had received from some person other than Mr. Wallis. During the conversation with the chief of police and Detective Craddock as to what should be done about the matter Mr. Pavlovich said he had other dishonored checks at his place of business. The chief of police directed Detective Craddock to go with Mr. Pavlovich and see the checks. Among them was found the $10 check drawn by J. C. Wallis, which Detective Craddock took to police headquarters. While he and the officer in charge (and perhaps Pavlovich) were examining and dis-

cussing the check, Detective Addington arriv-ed at headquarters, and, after examining the check, made the affidavit charging Wallis with obtaining the $10 under a false pretense. When Pavlovich returned to his restaurant, he was informed that Mr. Wallis had paid the $10 for which the check had been given. It appears that Mr. Wallis had returned the $10 on the morning after the check was issued, but did not get back the check; and thereafter, perhaps while Pavlovich was at the police station, Wallis called at the restaurant and paid another item of $10 which he had borrowed from the proprietor. When Pavlovich was informed that the amount for which the check had been given had been paid, he returned immediately to police headquarters. While he was there explaining matters, Detective Addington came in, having Wallis under arrest. Pavlovich then explained to Addington that the $10 had been paid, and requested that the charge be withdrawn. Mr. Addington refused to withdraw the charge or to release Wallis from custody. He was afterwards released on bail. The grand jury thereafter investigated the charge, and found nothing in it.

[1] Notwithstanding these inaccuracies in the details of the newspaper report of the accusation and arrest of Mr. Wallis, the jury concluded that the defense to this suit was borne out by the evidence, and rendered a verdict accordingly. The trial judge refused the plaintiff's application for a new trial, and rendered judgment rejecting his demand. Our conclusion, from an examination of the evidence, is that the newspaper report complained of is substantially true, and that the purport of it is not materially affected by its inaccuracies.

[2] The conduct of a detective, discharging the duties of a policeman, is a legitimate subject of newspaper comment and criticism. Such a comment is privileged, and does not render the newspaper publisher liable in damages without proof of actual malice.

Although the criticism in this case was severe, it appears to have been made in support of a public contention and in condemnation of what the publisher had good reason to regard as a public wrong.

[3] The appellant complains that he was subjected to ridicule by being called a "fly cop," by being accused of seeking a chance to "spear" Wallis, by having it said that he had "pulled off a bonehead stunt." It is in evidence that the term "fly cop" does not mean an officious policeman, as might be inferred from the ordinary meaning of the slang adjective "fly." We are informed that a "fly cop," sometimes called a "shadow bull," or a "tec," means nothing more nor less than a "plain clothes man," a sleuth, a detective. It also appears that to "spear" a person, in the figurative or metaphorical sense in which the expression was used in the article complained of, means to catch him ruthlessly, as by throwing a harpoon or gaff into him; and we understand that to "pull off a bonehead stunt" means nothing more nor less than to commit a blunder. The use of such metaphors or figures of speech would not be at all out of place at the baseball diamond or prize ring, and is not altogether inappropriate in a humorous write-up of police court proceedings.

The newspaper reporter, in this instance, credited the plaintiff with a keener sense of humor than he possessed; but we are not convinced that there was malice in the publication. Stories of detectives' escapades are read by men who enjoy a little nonsense now and then; and it would take much of the flavor out of the newspaper accounts of such proceedings if we should require that they be written up in the dignified manner of the opinions and judgments of this court. For example, although we might deem it more appropriate to say, in commenting upon what we considered a mistake, that a reversible error or an abuse of discretion had been committed, a newspaper reporter

might well say, of a more or less serious error, without intending any disrespect, that a bonehead stunt had been pulled off.

The judgment appealed from is affirmed at the cost of the appellant.