(74 South. 556)

No. 21821.

EGAN v. SIGNAL PUB. CO.

(Feb. 12, 1917. Rehearing Denied March 12, 1917.)

*(Syllabus by the Court.)*

LIBEL AND SLANDER 48(2)—PRIVILEGE—CRITICISM OF PUBLIC OFFICER.

There are many matters in which sharp differences of opinion arise between a public officer and his constituents, and, as he is charged with the responsibility of acting for them, his acts are open to their criticism, and such criticism should not be construed as a libel of the individual when conscientiously directed, not against him, or his motives, but against his acts and their effects.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. § 145.]

Appeal from Eighteenth Judicial District Court, Parish of Acadia; Wm. Campbell, Judge.

Action by William M. Egan against the Signal Publishing Company. Judgment for plaintiff, and defendant appeals. Judgment annulled, plaintiff's demand rejected, and suit dismissed.

Smith & Carmouche, of Crowley, for appellant. Philip S. Pugh, of Crowley, for appellee.

Statement of the Case.

MONROE, C. J. This is an action in damages for libel, in which the evidence discloses the following facts:

In May, 1909, during the administration of plaintiff's predecessor in the office of mayor of Crowley, the city council passed Ordinance 349, establishing a "restricted district." Plaintiff was elected in April, 1910. In April, 1912, an ordinance was introduced for the repeal of Ordinance 349, and failed of adoption, by a vote of four to five. At some time preceding an election, to be held in April, 1914, some of the opponents of the "restricted district" revived the agitation of the question of abolishing it, and began to take steps to organize with a view to the election of a mayor and council who would make their opposition effective. Meetings were talked about, and perhaps held. A petition for the repeal of Ordinance 349 was prepared and signed by some 200 persons. An anti-administration ticket was in process of being made up for submission to the electors; and, either about that time or afterwards, notice was given of the intention to introduce another repealing ordinance. On the eve of the election, however, Mr. A. Rei-

ber, one of the agitators, had a conversation with plaintiff, from which he derived the impression that, if they would withdraw their opposition ticket and not insist upon immediate action, but would wait until January 1, 1915, he (the Mayor) would, then, accede to their wishes and have Ordinance 349 repealed. There is some conflict in the testimony in regard to the understanding, or misunderstanding, that was reached, but it is shown beyond dispute that there was a conversation concerning which defendant, himself, testifies as follows:

"Q. And you also heard the statement he (Reiber) made, that you had agreed, in the presence of Mr. Burt, I believe, to abolish the red light district, provided no opposition was put up against you? A. I never made such a statement. * * * Q. Do you remember anything about a conversation, held with Mr. Reiber in the mayor's office, in the presence of Mr. Underwood? A. Yes, sir. Q. Please explain what took place between you and Mr. Reiber at that time? A. I said I had no objection to their being there, or not being there; that I was not a party to the creation of the district; that it was put there before my time; and, I think, if I remember right, he made the statement that it should be abolished right now, and I said I would not consider it before January, 1915; and he spoke of a petition, and I said it was not necessary, so far as I was concerned, to have a petition, nor would it be. Q. Did you promise him, positively, that you would remove the district by January 1, 1915? A. No, sir; he promised to see me again, and he never came back."

It may be here remarked that this case was tried in 1915, and the evidence shows that plaintiff was, at that time, again before the people as a candidate for re-election to the office of mayor; that Burt, the then chief of police, was running on the same ticket; and that the candidate opposed to the mayor was J. W. Miles, the member of the council by whom the last-mentioned repealing ordinance had been introduced. Mr. Burt, called in rebuttal by plaintiff, gave testimony to the effect that the mayor made no promise in his presence to abolish the red light district, but that he (Burt) told Reiber that the mayor would do the right thing, provided he (Reiber) did not antagonize and keep annoying him; that he was satisfied that he would do the right thing; and further as follows:

"Q. You say that you were satisfied that he would do the right thing if he were not antagonized, and, if he were antagonized, he would not do the right thing? A. I meant to say that he would remove the district. I meant that he would remove the district if he would be let alone, because he told me so; I had done asked, myself."

C. W. Underwood, also, called by plaintiff in rebuttal, gave the following testimony concerning the conversations between the mayor and Reiber to which the latter testifies, to wit:

"I was in there to see the mayor by invitation of Mr. Reiber. He was in there, and he asked the mayor what he intended to do about the red light district. That is how it started. And he said, ' * * * Mr. Mayor, do you want me to get up a petition to present to you?' And he said, 'No, it is not necessary.' And he said that, in the event he should see fit, he would put them out of business on the 1st of January, if he did put them out at all, it was the middle of the summer then—I think it was then we were talking; and they went on talking, and he said that he would consider the matter, not from the standpoint of the petition, as suggested by Mr. Reiber, but, in the event that he did put them out of business, he would not do it before the first of the year, if he put them out at all. Q. Did he assign any reasons for his decision? A. He may have done so. I do not remember anything in particular; no, sir. * * * Q. You are positive that he did not make any promise to put it out? A. He stated specifically, but he made no promise; he was willing to take the matter up with a few representative citizens, is the way I understood him."

Reiber, however, appears to have carried out what he supposed to have been the understanding, so far as he could. The petition was not presented to the council, and, among those with whom he was immediately associated, the opposition ticket idea was abandoned. There were others, however, who do not appear to have been governed by Reiber's advice, and were disposed to press matters to an early issue. The summer came on, the heat of the discussion rose with the temperature, and an effort was made to have

the repealing ordinance passed at once, to take effect in January; but, while it was the custom of the council to hold its regular meetings monthly, that custom became, just then, more honored in the breach than the observance, and, though there seemed to be no difficulty about special meetings, no regular meeting (which was required for the purpose in question) was held between June and October; also, there were two vacancies, occasioned by resignations in the membership of the council, and no special elections were called to fill them, between June, 1914, and April, 1915. On October 6, 1914, a regular meeting was convened, the repealing ordinance was adopted, by a vote of four to three, the mayor vetoed it, and, on the following day, there appeared in defendant's newspaper, "The Daily Signal," an editorial containing a portion of the matter here charged to be libelous and reading, in part, as follows:

### "The Mayor's Veto.

"Early in the summer, there was interest shown with reference to abolishing the red light district, and Mr. J. W. Miles, alderman at large, gave notice of intention to introduce an ordinance to that effect, which he did, and it has been awaiting a regular meeting, at which it might be considered, until last night.

"For reasons best known to the opponents of the adoption of this ordinance, a period of four months elapsed without a regular meeting of the council. When the matter came up, Tuesday night, the vote stood, four for the adoption to abolish this plague spot and three to retain it. * * * As to members of the council, the measure carried, but Mayor Egan vetoes the measure. We should like to know how Mayor Egan is going to square himself with the people on this matter. He had pledged himself to support a measure to remove the district at the close of the year, and, when the ordinance came up, regularly, received a majority vote, without the second ward having a representative present, Mayor Egan has the nerve to go back on his promise and veto the ordinance. How do you like that, good people? *Do you approve of the action of this self-constituted champion of the red light?*"

The matter set out in the petition as libelous is that beginning with the words, "As to members of the council," of which, "Do you approve the action of this self-constituted

champion of the red light," are italicized, and it is alleged, concerning them, that:

They were "intended to refer, and did refer, to your petitioner as the champion of the 'red light,' to the knowledge of the readers of said paper; that the 'red light' was intended to apply to the restricted district in the city of Crowley; * * * that the said false, scurrilous, defamatory, and malicious editorial was reproduced * * * in the Crowley Signal, the weekly paper of the Publishing Company; and that said article was published in the said two newspapers aforesaid for the purpose of injuring, maligning, and libeling your petitioner in his official capacity of mayor of the said city, as well as for the purpose of injuring his private character."

Plaintiff also complains of passages in certain letters from correspondents, members of the clergy, mostly, that were published in defendant's papers within a week or ten days after the veto of the ordinance.

The matters charged as libelous in the letters, respectively, are (in one letter):

"We may well stand ashamed and aghast at the spectacle of any man or woman, especially those in authority, being a party to a district the shame of male and female alike."

In another letter:

"Now the die is cast, the Rubicon must be crossed. If the mayor pledged himself to support a measure to abolish the hell-hole, the skunk's resort, and, then, in the face of that pledge, and the majority of the council, deliberately vetoes the measure, I consider he has offered insult to the people he made the promise to and proposes to retain this cursed institution in our city in open defiance of the best people. Men and women of Crowley, do you stand for such? I think not. Shall we keep silent? Shall these four councilmen and the Signal stand alone in the fray? No, never. As a citizen, I shall speak out; as a Christian, I shall pray; and, as a preacher of the Gospel of Christ, I shall proclaim against such public or private injustice. As to the vice district (it is well named, for nothing else but vice is taught and practiced within its hellish domain), there is but one of two reasons why men want to keep it going. One is to make money. The other is that vile men may gratify their hellish lusts. As to the first mentioned, it occurs to me that, if men want to maintain a vice district to make money, it would be nothing but fair for them to furnish the material from their own families with which to run the business. I am perfectly willing for any member of my family to give part of their time working in any institution that I support. I think men should put up the material or shut up their nonsense."

In a letter from a third correspondent, the paragraph complained of amounts to but an elaboration of the idea last above expressed.

On the trial of the case, the different writers, editorial and epistolary, disclaimed any intention of injuring the plaintiff, either in his official or personal character, and stated that their attacks were directed against the thing, institution, or whatever it may be called, which, by virtue of his veto, he had maintained in their midst. Considerable testimony was adduced by plaintiff on the subject of damages, but none were proved, and his re-election, after the trial, would seem to indicate that he has sustained none. Nevertheless, it was competent for the trial judge to assess and award damages, if he believed that plaintiff had been libeled. C. C. 2315, 1934.

### Opinion.

1. We can discover no libel in the editorial. The ordinance, which, in effect, abolished the "restricted district," had been passed by a majority of the council, and it was within plaintiff's discretion to make it effective, by his approval, or to annul it, by his veto. He chose to annul it, and thereby left the "restricted district" to a continued existence. His complaint is that he was referred to in the editorial as the "self-constituted champion" of the "red light." "Red light" is merely another name for "restricted district." "Champion" is defined to be:

"(1) One who engages in any contest; a combatant; a fighter; esp. in ancient times, one who contended in single combat in behalf of another's honor, or rights, or sometimes, of his own; now, one who acts or speaks in behalf of a person, or a cause; defender; an advocate." Web. New Int. Dic.

Plaintiff therefore falls entirely within the definition of "champion," as the term is now used. He was of opinion that the maintenance of the "restricted district" was the proper, or better, method of dealing with an existing evil, and he acted in support of that "cause," or opinion, thereby maintaining it, successfully, which is something more than to have merely advocated it, and, as he did that of his own volition, he was a self-constituted champion.

2. Nor, can we discover any libel in the second matter of which plaintiff complains.

He was the mayor of the city, placed in that position by the people of the city; his official acts were those of the people, through their chosen representative; and, if those acts did not represent their views, or were not in their interest, it was their privilege to criticize them. If they believed that they tended to vice and misgovernment, and hence were ashamed of them, they had the right to say so. Many people have, within the past year or two, expressed themselves as ashamed of the President of the United States, and of our country; some, because he has not involved us in war; others, because, it has looked, at times, as though we might become so involved. The words, "being a party to a district, the shame of male and female alike," as used in the paragraph under consideration, when considered with their context, mean nothing more than that plaintiff, by his vote, continued the "restricted district" in existence when it was within his power to have destroyed it; and, as he has been re-elected, with that issue presented to the people of Crowley, it would seem that the writer of the letter must now be ashamed of a majority of his fellow citizens. On the other hand, they may feel a sense of superiority upon the assumption that they are better informed and entertain more enlightened views than he, as to the subject under consideration, and feel ashamed of him. Who knows?

3. The next paragraph to be considered is more objectionable and makes unpleasant reading, but it will be observed that the writer of the letter, after expressing himself upon the subject of the mayor's veto, proceeds to give an opinion of mankind in general, including, perhaps, more particularly, the men

·of Crowley who were not in favor of abolishing the restricted district.

"There is but one of two reasons," he says, "why men want to keep it going. One is to make money. The other is that vile men may gratify their hellish lusts."

Which we take to be intended rather as a ·commentary upon the depravity of the average man, in which he should not be allowed· to indulge himself, than as a libel upon the mayor. The writer of the letter believes, apparently, that a restricted district is, in effect, a means of propagating vice and not ·of segregating and dealing with an existing ·evil, and yet we are quite sure that he would be willing to admit that, whatever may be its practical operation, the intention is to segregate a certain class of vicious or unfortunate people, and thereby subject them, more conveniently, to control and perhaps protection, and thereby, also, the better to protect so-·ciety from the influence of their more immediate presence. However that may be, we ·do not think the quoted expression can reasonably be considered as directed against the plaintiff any more than against any other man who may entertain a different view from that of the writer of the letter upon the subject of the policy and morality of establishing a restricted district. And the same thing may be said of the remainder of the quoted language, consisting of a mere argument ad hominum equally unconvincing and offensive, but not libelous, and of the last publication mentioned in the preceding statement of the case.

In justice to the plaintiff, we may say that, while the revenue derived by the city was an element that was considered by him in his veto of the repealing ordinance, his main reason for the veto was that he believed segregation and regulation was much better than to have "that class of people" all over the town, or as he says in another place:

"I have seen it tested here, and, after considering the matter, I decided that the regulation was the best solution of the question. It was better to have them all together, and you could know what was going on and keep them straight, than to have them all up and down the street."

There are many matters in which sharp differences of opinion arise between a public officer and his constituents, and, as he is charged with the responsibility of acting for them, his acts are open to their criticism, and such criticism should not be construed as a libel of the individual, when conscientiously directed, not against him or his motives, but against his acts and their effects.

In our opinion, the criticism of which plaintiff complains is of the character thus indicated and furnishes no basis for this action.

It is therefore ordered that the judgment appealed from be annulled, that plaintiff's demand be rejected, and that this suit be dismissed, at his cost in both courts.

———

(74 South. 559)

No. 21904.

CITY OF SHREVEPORT v. SOUTHWESTERN GAS & ELECTRIC CO.

(Feb. 12, 1917. Rehearing Denied March 12, 1917.)

*(Syllabus by the Court.)*

1. STATUTES �kö=181(1), 183, 188—CONSTRUCTION — OBVIOUS INADVERTENCE — PRESUMPTION.

Occasions may now and then arise when, from the necessity to make particular statutes intelligible and operative, courts will correct or ignore obvious inadvertences therein, but it should never be forgotten that the power to make the laws is not vested in the judiciary; that, when the department in which that power is vested has expressed itself *in* unambiguous language, the presumption arises that it intended that which the language imports, and that in this state it has prescribed for the judiciary and for the public at large a rule of interpretation which is expressed in language of that character.

[Ed. Note.—For other cases, see Statutes, Cent. Dig. §§ 259, 261, 266, 267, 276.]