(77 South. 896)

No. 21212.

SMITH v. LYONS et al.

(June 30, 1917. On Rehearing, Feb. 25, 1918.)

*(Syllabus by the Court.)*

1. LIBEL AND SLANDER ☞6(2)—ACTIONABLE WORDS.

The posting of a letter denouncing another as an assassin of character, a liar, and unworthy of the respect and esteem of decent and fair-minded people, is libelous.

2. LIBEL AND SLANDER ☞1 — "LIBEL" DEFINED.

A libel is a malicious publication, expressed either in printing or writing, or by signs or pictures tending to either blacken the memory of one dead or the reputation of one who is alive, and expose him to public hatred, contempt, or ridicule.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Libel.]

3. LIBEL AND SLANDER ☞54 — DEFENSES — TRUTH.

A defendant in a civil action of libel may prove the truth or justification of the matter charged as defamatory; the truth of the words is a complete defense, whether the words on their face appear to be actionable, or are made actionable by reason of special damages.

4. LIBEL AND SLANDER ☞34, 48(3)—CANDIDATE FOR POLITICAL OFFICE — COMMENT — PRIVILEGE.

When a man becomes a candidate for an office, his character for honesty and integrity and his qualifications and fitness for the position are put before the public, and are thereby made proper subjects for comment. But as a general rule false allegations charging criminal or disgraceful conduct, or otherwise aspersive of character, are not privileged. On the other hand, it is held in some jurisdictions that matters having a bearing upon the character and fitness for office of a candidate may be published if they are in good faith and on probable cause deemed to be facts.

5. LIBEL AND SLANDER ☞48(3) — ANSWERS TO CANDIDATE'S QUESTIONS—PRIVILEGE.

Where a candidate, in a circular letter to voters, suggests matters for discussion, he cannot be heard to complain when the voters thus addressed answer by asking questions concerning such matters and about the administration of which the candidate has been a part.

6. LIBEL AND SLANDER ☞48(2)—PUBLIC OFFICER—PRIVILEGE.

The official acts of a public functionary may be freely criticized and entire freedom of expression used in argument, sarcasm, and ridicule upon the act itself, and then the occasion will excuse everything but actual malice and evil purpose in the critic; the occasion of itself will not excuse an aspersive attack upon the character or motives of an officer, and to be excused the critic must show the truth of what he has uttered of that kind.

7. LIBEL AND SLANDER ☞5, 33, 114—MALICE —PRESUMPTION.

The law presumes malice upon the one hand, and injury upon the other, where slanderous words are used, and damages will be awarded in a substantial amount.

Appeal from Twelfth Judicial District Court, Parish of Vernon; John H. Boone, Judge.

Suit by Dr. J. F. Smith against B. H. Lyons and another, with claim in reconvention by defendant Lyons. Judgment for defendant Lyons, dismissing plaintiff's demand, and plaintiff appeals. Judgment in so far as dismissing the suit reversed and decreed that there be final judgment in favor of plaintiff and against defendant Lyons in the sum of $500.

Sidney I. Foster, of Shreveport, and Hudson, Potts, Bernstein & Sholars, of Monroe, for appellant. Blanchard & Smith, and James G. Palmer, all of Shreveport, and W. W. Thompson and Hardin & Hardin, all of Leesville, for appellees.

SOMMERVILLE, J. Plaintiff, a physician residing and practicing his profession in the town of Leesville, in the parish of Vernon, where he is also a member of the police jury, claims damages from the defendants, the sheriff and his deputy, of the parish of Vernon, in the sum of $25,000, because of an alleged libel, wherein defendants denounced and posted petitioner "as an assassin of character, a liar, and unworthy of the respect and esteem of decent and fair-minded people."

Defendants filed several exceptions, which were overruled. There was no appeal taken therefrom, and these rulings are not before the court for review. They also answered, admitting the writing and posting complained of. Copying from the answer:

"B. H. Lyons admits that he wrote, printed, and caused to be posted, through his codefendant L. A. Smart, the circular attached to plaintiff's petition; but defendants deny that the said circular is slanderous, libelous, or defamatory in character, but is true. Defendants admit posting of the said circular, as set forth in paragraph 9 of plaintiff's petition, but deny that the said circular is libelous; and if the said circular was reproduced in the Shreveport Times and the Shreveport Journal defendants deny any connection with said publication, and for that reason are not responsible therefor. Defendants deny the allegations of paragraph 10 of plaintiff's petition, except that the circular, which is denied to have been libelous and slanderous, but true, was printed, published, and posted by defendants. * * * Especially denying that said circular was printed and posted falsely, maliciously, or without probable cause or excuse, but he avers the truth of the statement in said circular. For further answer to plaintiff's petition, defendants aver that the composition, printing, and publication of the said circular, upon which plaintiff bases his action, was justifiable on the part of defendants; that on or about the 9th day of April, 1914, for some time prior thereto, and for some time subsequent, the plaintiff in this suit was the proprietor and editor of the Toiler, a weekly newspaper published in the parish of Vernon, La.; and in the issue of April 9, 1914, there was published in said Toiler an editorial carrying the following headline in letters approximately seven-eighths of an inch in length, which reads as follows: 'Circular Letter Elicits Pungent Replies.' And following the said headline there appeared in said editorial in said Toiler a copy of a letter addressed by your defendant B. H. Lyons to his friends and to the voters of Vernon parish, La., which defendant Lyons had a right to address and distribute, and which was intended by the said Lyons as a fair and unbiased statement of the conduct of his office during the time he had served as sheriff of Vernon parish; but said editorial in said Toiler carries copies of two purported letters, which are in said editorial alleged to have been received by the said Lyons from different individuals in the parish of Vernon, and which said letters undertake, without any cause whatever, to slander and defame the said Lyons and hold him up to ridicule and scorn, and slander his good name and reputation, and import to him evil and sinister motives in the conduct of his office, and charged him expressly and impliedly with graft, corruption, and favoritism."

Then follow the circular letter written by the defendant Lyons to the voters of the parish of Vernon, and two letters written in reply thereto and published in the Toiler, referred to in defendant's answer.

Defendant Lyons then alleges that he demanded of plaintiff the names of the writers of the letters referred to, and that plaintiff refused to give them, whereupon he proceeded to hold plaintiff responsible for the letters, and—

"he printed and caused to be posted by his codefendant, L. A. Smart, the circular attached to plaintiff's petition in which he told the truth, and defendant Lyons did so purely in defense of his good name and reputation, and so stated in the said circular, that the public might know the full facts, and in order that the defendant Lyons might have an opportunity to publicly defend his good name against slander and disrepute, brought on by the said malicious, false, slanderous, and libelous statements contained in the said letter and appearing in the said editorial of the said newspaper, and that defendant Lyons was justified in so doing, and in said circular posted by him he told the truth."

Defendant further alleges that he believed plaintiff to be the author of the two letters referred to, and of which he complains, and that that was the cause of his having posted plaintiff in the way he did; that the defendant Lyons was justified in printing the said circular attached to plaintiff's petition in defense of the good name and reputation which he has always enjoyed.

Then, assuming the character of plaintiff in reconvention, Lyons asked for $25,000 damages against plaintiff for the slanderous, libelous, and defamatory editorial referred to. There was trial by jury and a verdict rendered reading as follows:

"In the case of J. F. Smith v. B. H. Lyons, in which J. F. Smith is the plaintiff and B. H. Lyons the defendant, we, the jury, find in favor of the defendant. No damages shall be paid by either party."

L. A. Smart, codefendant, was not mentioned in the verdict, and he was not mentioned in the judgment based thereon. The judgment is:

"Therefore, pursuant to said verdict, there is judgment herein dismissing plaintiff's demand at his cost."

Plaintiff obtained an appeal from the judgment, and gave bond in the following words:

"Whereas, the above bound J. F. Smith has obtained orders of appeal, suspensive 'and devolutive, from a certain judgment rendered against him in the district court in and for the parish of Vernon, in favor of B. H. Lyons, in suit No. 2169 on docket of said court, entitled J. F. Smith v. B. H. Lyons et al., returnable to the honorable Supreme Court of Louisiana on or before the 25th day of March, A. D. 1915," etc.

Defendant Lyons did not appeal, and the reconventional demand filed by him and disallowed by the judgment of the district court is not before the court for review. The only appeal to be considered is that taken by plaintiff from the judgment against him and in favor of B. H. Lyons, one of the defendants.

Plaintiff and defendant are both respected citizens in the town of Leesville, where they both hold offices, and belong to rival factions in politics of that section of the state. They are both owners of newspapers in that same place, and they are brothers-in-law, who have long been on unfriendly terms with one another.

Plaintiff sues defendant for damages because of an alleged libel posted by the latter, and the latter pleads the truth of the alleged libelous matter.

"Every man has a right to be protected from defamation, as much as from assault and bodily harm. His reputation is his property, and more valuable than property. To maintain one's good name unimpaired is the anxious concern of all who possess good names. Plaintiff, when denounced and villified, did not take into his own hands the redress of his grievance. He appealed to the courts. This is what the law counsels. The courts shall be open, and every person, for injury done him, shall have adequate remedy. Such is the mandate of the organic law. It means substantial redress, not the mere form of it." Simpson v. Robinson, 104 La. 180, 28 South. 908.

There is to be considered only a question of fact. Did defendant write the truth when he posted plaintiff as "an assassin of character, a liar, and unworthy of the respect and esteem of decent and fair-minded people"? The editorial published in the Toiler, owned by the plaintiff, and said by defendant to be the cause of the posting by him of the plaintiff, is in the following words:

"Circular Letter Elicits Pungent Reply.

"Recently B. H. Lyons sent out some circulars dated March 20, 1914, which have elicited a few prompt replies. We have been requested to publish these retorts in the Toiler, together with the circular letter of Mr. Lyons, which follows, preceding the replies:

" 'Leesville, Louisiana, March 20th, 1914.

" 'Dear Sir: It has been my intention for some time to address you, and other voters, a letter in which I might lay before you certain facts for your consideration.

" 'For several years, if you remember, there has been a cry from all over the parish to the effect that our public money has been recklessly and dishonestly spent, and that graft prevailed. It was your hue and cry that you wanted to elect officers who would put a stop to all such dishonest practices and would fearlessly enforce the law. Upon that platform I made my race for sheriff and was elected by a handsome majority; not only I, but the entire ticket of my friends who made the campaign with me.

" 'What have been the results since your new officials qualified? Crime has decreased to a minimum, court and criminal expenses have been decreased to almost half what they had been for the past ten or twelve years, law and order prevail throughout the parish, and those violating the laws are prosecuted vigorously—without fear or favor.

" 'The only thing which has arisen to cause confusion and dissension among our people comes of an honest endeavor to carry out a campaign pledge. I promised that if grafting was going on, as had been so long charged, I would endeavor to discover it and give all the assistance in my power toward breaking it up.

" 'Now, what has been the result? When about $30,000 or $40,000 of your money was about to be stolen or squandered, did I, as your sheriff, sit by and see it done? Did not I, with the assistance of your able district attorney, catch the ringleader of a grafting scheme, red-handed, with the goods on him, was he not prosecuted, convicted and sentenced to the penitentiary for a term of years? Were not his confederates all exposed and thereby caused to resign from the police jury, in order that they might do no more harm?

" 'Remember, you told me before my election that you wanted such things stopped, and the only way to stop them was to catch the guilty parties and to prosecute them. Have not your officials done this very thing? Tom Addison was the one who was caught outright; his confederates could not be prosecuted before the courts because the evidence against them was not sufficient for a conviction, even though we felt satisfied that they were in the conspiracy. Tom Addison was urged to make a clean breast of the whole plot, so that all implicated might share with him equally in his punishment. Addison could have rendered the people and officers a valuable service by making a complete

confession. The officers had no favors to extend and wanted to see all punished alike, but you cannot convict people without sufficient evidence.

" 'Now, under such circumstances, what would you as a reasonable man have done? Would you have turned Tom Addison loose because you could not get sufficient evidence to convict his confederates?

" 'Suppose three men should go to your place and steal a horse from your barn, and you should succeed in catching one of the three with the horse in his possession. Would you turn this man loose, and not prosecute him because you failed to get evidence against the other two, whom you are satisfied in your mind were equally guilty? You would not.

" 'Just as it was in the police jury matter. The very end which you claim to desire having been accomplished, why is this confusion being spread among the people? Why these efforts to discredit the acts of your officials who did their plain duty? Do you think it a pleasure for your officials to go after their friends for wrongdoing? Tom Addison was our personal and political friend, and no one regretted his downfall more than did the officers of your court.

" 'There are certain people who have always opposed Tom Addison and were loud in their denunciations of his acts because he was not of their political faith or faction. These very ones are now pretending indignation at his conviction, in order to make political capital of it.

" 'We have at all times an element who will try to discredit any and all acts of your officials; therefore you will do well to think well before condemning those who are trying to serve you well and honestly.

" 'I wish, in conclusion, to give you warning that if the laws of your country are to be enforced the officials of your parish must have the co-operation and moral support of our people, for without this our hands are tied and no good can be accomplished.

" 'With assurances of my best wishes, I am,

" 'Yours very truly,      B. H. Lyons.'

"Mr. Dinkinspeil acknowledges the receipt of the above circular letter, and replies as follows:

" 'Mr. B. H. Lyons, Sheriff of Vernon Parish, Louisiana—Dear Sir: Your letter received and will state that the 'dear people' have been expecting to hear from you for some time.

" 'In the first place I wish to state that there has been an effort on the part of the honest people of Vernon parish to have their affairs managed as they should be, and it is generally conceded that graft in many forms exist; and if a man runs on a ticket to prevent graft it is expected that he will do all within his power to prevent it. In that connection allow your humble writer to state that when the Vernon parish school board let the contract for the public printing, did our honorable sheriff try to save the parish dollars? Did he not, with his legal adviser present, state that they [the school board] could not let the con-

tract for less than the legal rate? Were there not people ready and willing to submit this to competitive bidding? Did our honorable sheriff try to save the parish money here?

" 'As to crime being less, if it is, that will explain a lessening of court expenses; but if all the prisoners who have escaped were kept in jail from the time they were to serve, the expenses probably would have been greater.

" 'Have you prosecuted, with the assistance of our able district attorney, without fear or favor? Why did one of your commissioned deputy sheriffs, after he had cut a man almost to death, requiring 34 stitches to sew him up, escape punishment? Is this punishing all alike? There are other examples of this fear and favor business, but this one will suffice on this point.

" 'No, Mr. Lyons, the people do not wish that any one who disobeys the laws should go unpunished, but they want a square deal to all—classes and masses.

" 'Yes, Tom Addison was your personal and political friend, and I feel that it was hard for you to send him to prison. True, there were some people who were opposed to Tom Addison who are now in sympathy with him because he bears the burdens of his "confederates." By the way, how can you admit that Addison had "confederates," and by your letter practically admit that you know who they were, and claim that there was no evidence to convict? Is not a "confederate" in the commission of a crime as guilty in the law as the person who commits the crime? Your horse-stealing story is not a fair illustration. If you catch a thief with a horse stolen from some one's barn, you are told that the thief had confederates, but you don't know who they are; no one with an ounce of sense would expect you to arrest and punish a confederate who was not known to you. Quite different in the grafter case: You "caught the ringleader red-handed"; you admit that he had "confederates" and you leave the inference that you know who they were. If you know a man to be a confederate in the commission of a crime, what other evidence do you and our district attorney want?

" 'We always have the element that you speak of in your letter, and, if the writer can recall, up to the time you were elected to the present office for the past sixteen years, you were the ringleader of that element who continually harped until you were elected; and now that you are in the saddle, any comments as to officials are entirely out of order.

" 'The element that is now looking without favor upon your administration is not of the element that you would have believe, but are good, honest men, who wish for the welfare of our parish and for the defeat of all unfair methods.

" 'In conclusion, with regards to co-operation, the writer hopes that the people of Vernon will demonstrate the principle of co-operation at the next regular election by placing the stamp of rejection on any who have misled them.

" 'Yours truly,            Dinkinspeil.'

"Mr. Jonathan Josephus Jenkins is a little facetious, but answers the sheriff's letter very pithily, as follows:

" 'Hon. B. H. Lyons, Sheriff, Leesville, Louisiana.

" 'Dear Sir: I received your very much appreciated letter of the 20th of March, to-day. Was indeed glad to know that you had not forgotten me altogether, although it had been more than two years since I had received a letter from you. I am rejoiced to know that the court and criminal expenses of our parish have been decreased almost half what they were ten or twelve years past; that crime has been reduced to a minimum, and that law and order prevail throughout the parish of Vernon; that those violating the law are being vigorously prosecuted, without fear or favor, since you and the entire ticket of your friends have been conducting the affairs of the parish. Then, Lord! Lord! How proud and how rich it makes me feel when I think of thirty or forty thousand dollars of our money you saved that was about to be stolen, or squandered by your friends, the grafting police jurors on the ticket with you, and who made the campaign with you.

" 'Yes, well do I remember "the hue and cry that went up all over the parish that our public money was being recklessly and dishonestly spent and that graft prevailed." And that "on that platform you made your race for sheriff" won the fight, "by a handsome majority," and within less than two years you have demonstrated the fact that you were eminently correct in so far as those of your friends (elected with you on said ticket) were concerned, at least.

" 'Lord! Lord! What confusion it has caused among your friends. It really seems that there is a vague suspicion, or fear, that all the grafters may not yet be out of office. There will be grave forebodings for the next two years lest others are tempted and trapped.

" 'You ask, "Why is this confusion being spread among the people?" Why, bless your soul, I see no evidence among the people in general. They seem united and harmonious. I think the confusion is confined to a very small percentage of the people. We have an occasional gathering out here in the sticks. Everything is serene. All the people are together on most questions on which they are fully informed and are constantly seeking information about matters of importance. You could enlighten us on many points, I am sure; I will tell you some things I heard a day or two ago at neighbor Jones' chimney dobbing. Mr. Jones had a letter from you and quoted what you said about Addison's confederates' being fully exposed and caused to resign and Mr. Jones wanted to know if resignation was the penalty fixed by law for a fully exposed grafting official. Then Bill Smith, he wanted to know how a man could be fully exposed of the commission of a crime if the evidence was insufficient to convict?

" 'Then your platform, as laid down in your letter, was discussed, especially that part in which you promised to put a stop to grafting and enforce economy in the disbursement of the public funds. Our pastor was there, and he said he had preached that all over the parish for you two years ago, sincerely believing you would do it, but that the first rattle out of the box you had presented a bid to that grafting police jury, proposing to do all the parish printing for full legal rates, and at the same time the editor of the Toiler presented a bid to do the work for just half what your bid called for, and that you went before the police jury and succeeded in getting them grafters to do the work for four years, contrary to your platform pledges of economy in use of public funds and the stopping of graft of the people's money. How about that, anyhow? Somebody said that if that were true you ought to follow suit and tender your resignation, too; that birds of one feather should all flock together. Somebody also said that you, as president of the Hicks Abstract Company, tried to get the job of estimating the pine timber of the parish, but that your bid was turned down by the police jury a short time before Addison was arrested. How about that? Was your company actually trying to get that job? Did Addison turn you down just before you turned him up?

" 'Yours respectfully,
" 'Jonathan Josephus Jenkins.' "

The names Dinkinspeil and Jenkins, signed to the foregoing letters, were assumed; and the letters were shown on the trial to have been written by Mr. Lee McAlphin and Mr. Will Bridges, of Vernon parish, who wrote in reply to the circular letter received by them from the defendant Lyons, wherein he reviewed the administration of his office. On the refusal of plaintiff, the editor and manager of the Toiler, to give the real names of the correspondents, Dinkinspeil and Jenkins, defendants wrote and posted the following poster, which reads:

"B. H. Lyons, Sheriff and Tax Collector, April 13, 1914. Vernon Parish, Leesville, Louisiana.

"To the Public:

"There having appeared in —— week's issue of the Toiler two articles appearing as personal letters directed to me and given to the public as genuine letters with names signed thereto to mislead the reader to believe that such letters were really genuine and had been written by the parties whose names appear thereto. when as a matter of fact no such persons exist.

"Therefore I addressed to Dr. Smith, editor of the Toiler, about 8 o'clock Saturday morning, the following letter:

" 'Dr. J. F. Smith, Editor Toiler:

" 'I noticed published in your paper two letters addressed to me, personally. I have received no such letters from parties whose names are signed as the authors. I now call on you for those originals, and to know' how my personal letters came into your possession, and by what authority you publish them .without my permission.

" 'Very respectfully,     B. H. Lyons.'

"To this communication he sent a verbal reply that he would not disclose the authors. I then made a formal demand as shown by the following:

" 'Dr. J. F. Smith, Editor Toiler:

" 'Sir: I now demand of you the authors of those letters appearing in your 'paper addressed to me, and unless given I shall hold you responsible as the writer.

" 'B. H. Lyons.'

"To this last I received the following reply:

" 'Leesville, La., April 10, 1914.

" 'Mr. B. H. Lyons (Sheriff).

" 'Dear Sir: Your two notes received and in reply will say that your request cannot be granted. However, the courts are the proper channels through which to settle differences. My rule is never to divulge authors.

" 'Very respectfully,     J. F. Smith.'

"Dr. Smith, having assumed this attitude, makes it necessary for me to place the responsibility on him as the writer. It is a well-known fact that Dr. Smith and I are brothers-in-law, and for the past ten years have had no dealings with each other. It is also well known that during this time I have avoided him in all matters, because, on account of our family connection, I did not want to have a personal difficulty with him. Despite the fact that I have respected the family connection and have avoided any personal difficulty with him he seeks, by unfair and underminded methods, to bring me into disrepute and slander my good name.

"This attitude and continued effort at defamation I do not feel that I am compelled to stand idly by and permit without saying a word in my defense, even though the family connection is such that it would be highly desirable to pass the insults by.

"I therefore take this method of denouncing Dr. Smith as an assassin of character, a liar, and unworthy of the respect and esteem of decent and fair-minded people.

"B. H. Lyons."

[1-3] The language used in the poster is libelous per se. Defendants having admitted the use and publication of the language, the burden was upon them to prove the truth of their allegations; or, as stated by defendants on their brief, that there was an "avoidance on account of the publication of the libelous matter, provoking defendant into the issuance of the circular complained of," in mitigation of damages.

In the circular letter issued by the defendant, when he, as sheriff, gave an account of his stewardship, he stated that he would lay before them certain facts for their consideration. Among other things he said:

"For several years, if you remember, there has been a cry from all over the parish to the effect that our public money has been recklessly and dishonestly spent, and that graft prevailed. It was your hue and cry that you wanted to elect officers who would put a stop to all such dishonest practices and would fearlessly enforce the law. Upon that platform I made my race for sheriff and was elected by a handsome majority; not only I, but the entire ticket of my friends who made the campaign with me."

He then asked the question:

"What have been the results since your new officials qualified?"

He then referred to confusion and dissension among the people, caused by an honest endeavor on the part of the administration to carry out the pledges given during the election, to punish those violating the law, and to prosecute them without fear or favor. He then adds:

"Now, what has been the result?" "When about thirty or forty thousand dollars of your money was about to be stolen or squandered, did I, as your sheriff, sit by and see it done? Did not I, with the assistance of your able district attorney, catch the ringleader of a grafting scheme, red-handed, with the goods on him? Was he not prosecuted, convicted and sentenced to the penitentiary for a term of years? Were not his confederates all exposed and thereby caused to resign from the police jury, in order that they might do no more harm?"

He then states that the people wanted these things stopped—

"and the only way to stop them was to catch the guilty parties and prosecute them. Have not your officials done this very thing?"

Again he asked:

"Now, under such circumstances, what would you as a reasonable man have done? Would you have turned Tom Addison loose because you could not get sufficient evidence to convict his confederates?"

Again he asked:

"Why is this confusion being spread among the people? Why these efforts to discredit the acts of your officials who did their plain duty? Do you think it was a pleasure for your officials to go after their friends for wrongdoing? Tom Addison was our personal and political friend, and no one regretted his downfall more than did the officials of your court."

He then closed his circular letter as follows:

"We have at all times an element who will try to discredit any and .all acts of your officials; therefore you will do well to think well before condemning those who are trying to serve you well and honestly. I wish, in conclusion, to give you warning that if the laws of your country are to be enforced the officials of your parish must have the co-operation and moral support of our people; for without this our hands are tied and no good can be accomplished. With assurances of my best wishes, I am, yours very truly,                    B. H. Lyons."

This letter, with its questions, brought the two answers from "Dinkinspeil" and "Jonathan Josephus Jenkins," who had been addressed by the defendant. These letters were published by the plaintiff, in the Toiler, a newspaper owned by him; and defendant sought, in his reconventional demand, to hold plaintiff responsible for alleged defamation and libel contained therein. Mr. Bridges, signing himself "Dinkinspeil," answered:

"Your letter received, and will state that the 'dear people' have been expecting to hear from you for some time."

The writer agreed with the defendant and conceded that graft in many forms existed in the parish, and said:

"If a man runs on a ticket to prevent graft, it is expected that he will do all within his power to prevent it."

The defendant had stated in his circular letter:

"I promised that if grafting was going on, as has been so long charged, I would endeavor to discover it and give all the assistance in my power toward breaking it up. Now, what has been the result?"

And Mr. Bridges answered:

"In that connection allow your humble writer to state that when the Vernon parish school board let the contract for the public printing, did your honorable sheriff try to save the parish dollars? Did he not, with his legal adviser present, state that they [the school board] could not let the contract for less than the legal rate? Were there not people ready and willing to submit this to competitive bidding? Did our sheriff try to save the parish money here?"

There is an insinuation here that the defendant, sheriff of Vernon parish, did not try to save the parish any money in letting the contract for public printing, and that he advised the school board that it could not let the contract for less than the legal rate, although there was a party ready and willing to submit a bid at less than the legal rate for the work to be done. But the insinuation does not appear to be false, or without any foundation. Defendant, while on the witness stand, testified in reference to this matter:

"I appeared before the school board in connection with the election of a parish printer, and my contention before the school board was to the effect that there was nothing in the law calling for the work, and their only duty in the premises was to elect a parish printer, and that the law fixed the compensation. That was my position before the school board, and was the position they took and acted upon. * * * Q. You say that you told them that their only duty was to elect a parish printer? A. Yes, sir; their duty under the act was to elect a printer, and in that connection Mr. Bradford [in the employ of the defendant] and Dr. Smith were placed in nomination, and Mr. Bradford got a majority of votes; in fact I do not think Dr. Smith's nomination got a second."

On this point Dr. Smith, plaintiff, testified that he had prepared and submitted a bid at 50 per cent. of the legal rate for the printing, but that his bid was not opened; and that the defendant stated:

"That he was not there to submit cutthroat prices; that the law was fixed that they could not receive bids for the public printing, and that they could not let it out for less than the

legal rate that was fixed; and that the contract was awarded to the defendant, or his employé."

The witness is corroborated in his testimony by the president and one member of the school board.

[4, 5] It cannot be said, under such circumstances, that the correspondent wrote or insinuated falsely when he asked:

"Did your honorable sheriff try to save the parish dollars? Did he not, with his legal adviser present, state that they [the school board] could not let the contract for less than the legal rate? Were there not people ready and willing to submit this to competitive bidding? Did our sheriff try to save the parish money here?"

The question was pertinent and legitimate under the circumstances of the case, and related to the facts which occurred at the time and which served to contradict the claim of the defendant when he asked the writer of the answer what had been the result since your new officials qualified, and if court and criminal expenses had not been decreased to almost half what they had been during the past? The defendant brought the retort upon himself; and since there was foundation for the complaint, for which the defendant alone was responsible, he has not proved that the insinuation contained in the letter was false.

Mr. Bridges replied further to a part of the assertion, in an argumentative way:

"As to crime being less. If it is, that will explain a lessening of court expenses; but if all the prisoners were kept in jail from the time they were to serve, the expenses probably would have been greater."

There is no insinuation in the language used that defendant had opened the doors of the jail and permitted prisoners to escape. The argument was that if the prisoners had not escaped, and had been kept in jail for their full terms, that the expenses would probably have been greater than they had been. There is nothing false in this statement. Prisoners had escaped, and the jail expenses had been less.

Then follows the statement by the defendant that:

"When about thirty or forty thousand dollars of your money was about to be stolen or squandered, did I, as your sheriff, sit by and see it done? Did not I, with the assistance of your able district attorney, catch the ringleader of a grafting scheme, red-handed, with the goods on him? Was he not prosecuted, convicted and sentenced to the penitentiary for a term of years? Were not his confederates all exposed and thereby caused to resign from the police jury, in order that they might do no more harm? Remember, you told me before my election you wanted such things stopped, and the only way to stop them was to catch the guilty parties and to prosecute them. Have not your officials done this very thing? Tom Addison was the only one who was caught outright; his confederates could not be prosecuted before the courts because the evidence against them was not sufficient for a conviction, even though we felt satisfied that they were in the conspiracy. Tom Addison was urged to make a clean breast of the whole plot, so that all who were implicated might share with him equally in his punishment. Addison could have rendered the people and officers a valuable service by making a complete confession. The officers had no favors to extend and wanted to see all punished alike, but you cannot convict people without sufficient evidence. Now, under such circumstances, what would you as a reasonable man have done? Would you have turned Tom Addison loose because you could not get sufficient evidence to convict his confederates?"

The party addressed answered:

"Yes, Tom Addison was your personal and political friend, and I feel that it was hard for you to send him to prison. True, there are some people who were opposed to Tom Addison who are now in sympathy with him because he bears the burdens of his 'confederates.' By the way, how can you admit that Addison had 'confederates' and by your letter practically admit that you know who they were, and claim that there was no evidence to convict? Is not a 'confederate' in the commission of a crime as guilty in law as the person who commits the crime? * * * In the grafter case, you 'caught the ringleader red-handed'; you admit that he had 'confederates,' and you leave the inference that you know who they were. If you know a man to be a confederate in the commission of a crime, what other evidence do you and your able district attorney want?"

This again is argumentative in form. The writer of the circular letter admits that

Tom Addison had confederates, and the questions asked in connection therewith are respectful in tone, and are not based upon any false accusation whatever. The questions are based on the allegations made by the defendant himself in his circular letter addressed to the writer of the answer.

Defendant stated in his circular:

"Law and order prevail throughout the parish, and those violating the laws are prosecuted vigorously—without fear or favor."

Bridges, in reply, asked:

"Have you prosecuted, with the assistance of our able district attorney, without fear or favor? Why did one of your commissioned deputy sheriffs, after he had cut a man almost to death, requiring 34 stitches to sew him up, escape punishment? Is this punishing all alike? There are other examples of this fear and favor business, but this one will suffice on this point."

Here is an indirect charge of favoritism. The writer was asking about an occurrence which actually took place, as testified to by defendant himself, who says:

"That portion referring to the cutting was true, that he was cut."

The plaintiff testified that he, as a physician, attended to the wounded man, and sewed the wound up. But the favoritism here charged could only be charged to the district attorney, who is the officer of the parish charged with prosecuting offenders, and not to the defendant.

The writer of the answer said:

"There are other examples of this fear and favor business, but this one will suffice on this point."

This may have referred to defendant, the sheriff, only; but defendant himself testified that certain persons who had been sentenced to jail were not staying there all the time, so that there was a basis for the charge of favoritism against defendant, and the writer of the letter did not write falsely in making that statement.

The defendant has failed to prove that the writer of the letter signed Dinkinspeil made false accusations or charges against him as a public official, or as a man; and he was not therefore justified in saying that plaintiff, whom he held responsible for what Dinkinspeil had written, was "an assassin of character, a liar, and unworthy of the respect and esteem of decent and fair-minded people," because of anything stated in said letter.

The letter signed Jonathan Josephus Jenkins, written by McAlphin, is addressed to the defendant, and it is declared to be an answer to the circular letter written by him. In it reference is made to the assertion made by defendant that:

"Crime had decreased to a minimum, court and criminal expenses have been decreased to almost half what they 'had been for the past ten or twelve years, law and order prevail throughout the parish, and those violating the laws are prosecuted vigorously without fear or favor."

And after quoting other clauses from the letter the writer proceeds to say:

"Lord! Lord! What confusion it has caused among your friends. It really seems that there is a vague suspicion, or fear, that all the grafters may not yet be out of office. There will be grave forebodings for the next two years lest others are tempted and trapped."

The language cannot be construed as charging that defendant was a grafter, in the opinion of the writer. He says:

"There will be grave forebodings for the next two years lest others are tempted and trapped."

But there is no insinuation here that defendant may be one of those others who "are [to be] tempted and trapped."

The next point touched upon by the writer of the letter was Addison's "confederates" on the police jury, referred to by defendant in his letter; and the writer asked, or rather he said that Mr. Jones "wanted to know if resignation was the penalty fixed by law for a fully exposed grafting official." He then

asked "how a man could be fully exposed of the commission of a crime if the evidence was insufficient to convict." This matter was discussed in considering the Dinkinspeil letter, and requires no further notice.

The next matter referred to in the letter was the bid made by defendant, or on his behalf by the manager of the paper of which he (defendant) was the owner proposing to do the parish printing for full legal rates, while the editor of the Toiler presented a bid to do the work for just half defendant's bid, and that:

"Defendant went before the police jury and succeeded in getting them grafters to do the work for four years, contrary to your platform pledges of economy in use of public funds, and the stopping of graft of the people's money. How about that, anyhow? Somebody said if that was true you ought to follow suit and tender your resignation, too; that birds of one feather should all flock together."

This matter has been noted in discussing the Dinkinspeil letter; and the question has sufficient foundation in fact to have warranted the inquiry having been made of defendant. His manager did go before the police jury, and he succeeded in being elected parish printer, and getting a contract for public printing which called for twice as much as the bid made by the Toiler. In his letter addressed to the voters, including McAlphin, defendant wrote that he had certain facts to submit to them for consideration, and he then proceeded to say:

"For several years, if you remember, there has been a cry from all over the parish to the effect that public money has been recklessly and dishonestly spent, and that graft prevails. It was your hue and cry that you wanted to elect officers that would put a stop to all such dishonest practices and would fearlessly enforce the law. Upon that platform I made my race for sheriff and was elected by a handsome majority, not only I, but the entire ticket of my friends who made the campaign with me. What have been the results since your new officials qualified? Crime has decreased to a minimum, court and criminal expenses have been decreased to almost half what they had been for the past ten or twelve years, law and order prevail throughout the parish, and those viola-

ting the laws are prosecuted vigorously—without fear or favor."

Defendant thus presented to his constituents several matters for their consideration, and, in considering them and replying to the letter addressed to them, it seemed only natural for the writer to refer to the fact that defendant had secured the parish printing for full legal rates, when there was a bid to do that work for half that amount. No charge of graft is here made; but the question is simply that if defendant was interested in reducing the expenses of the parish why he had stood for the legal rate, and insisted upon having the printing at such rate, instead of letting the election and contract go to the lowest bidder. Then follows the declaration in the letter to the effect that "somebody said if that were true you ought to follow suit and tender your resignation, too, as birds of one feather should all flock together."

Public officials should submit to criticisms on the part of the people; and the suggestion that they resign from office because they have taken a contract which called for twice the sum of money that another bidder offered to do the same work for will be classed as privileged. Defendant could not be charged with graft because of having taken the printing contract at the legal rate, and he was not so charged. The charge was that he took the contract at twice the amount to do the work that another responsible bidder was ready to do it for. And, having done this, his correspondent suggested that he resign, as did the police jurors who were said to have been grafting, as "birds of one feather should all flock together." We think the reference to defendant, under the circumstances, was not based upon a false accusation, as grafting was not charged against him.

"The official act of a public functionary may be freely criticized, and entire freedom of

expression used in argument, sarcasm and ridicule upon the act itself; and that then the occasion will excuse everything but actual malice and evil purpose in the critic; * * * the occasion will not of itself excuse an aspersive attack upon the character and motives of the officer; and that to be excused the critic must show the truth of what he has uttered of that kind." Hall v. Ewing, 140 La. 908, 74 South. 190.

The last matter in the Jenkins letter complained of is:

"Somebody else said that you, as president of the Hicks Abstract Company, tried to get the job of estimating the pine timber of the parish, but that your bid was turned down by the police jury a short time before Addison was arrested. How about that? Was your company actually trying to get the job? Did Addison turn you down just before you turned him up?"

The Hicks Abstract Company, Limited, of which defendant was president, did actually solicit the job of estimating the pine timber of the parish in a written letter of date September 1, 1913, so there was sufficient basis for the question of the correspondent. It appears from this letter, and from the evidence, that the contract for estimating the timber of the parish had been let by the police jury, and that the district attorney who was absent at the time of the letting caused, on his return, the action of the police jury to be reconsidered. Thereupon the abstract company wrote to the police jury, saying that it (the jury) and the assessor "should be able to adjust the matter with the different large timber holders of the parish without incurring any large expense that would be necessary for the work." The letter then proceeds:

"However, if it is still the disposition of your honorable body to have this work done, we wish to make application to do the work. We are in a position to do this work thoroughly, and will furnish a satisfactory bond for a faithful performance of same, and we think we are in a position to save the parish considerable money over any proposition that has heretofore been made, either to do the work as a whole, that is, to estimate all the timber of the parish, or to estimate so many 40's selected at random for the different holdings and to strike an average,

from which the whole should be governed. This in our opinion would give the necessary result and would not cost nearly so much money. We would therefore suggest that, should you decide to give this matter your further consideration, that you state specifically just what you want, with the time in which the work should be completed, how the payments of the same are to be made, and submit the matter for competitive bids."

It may be that the suggestion of the abstract company was not actually turned down by the police jury, or that that letter actually contained a bid; but there was sufficient in connection with this matter to have justified an inquiry being made by one of the voters of the parish, particularly when defendant had invited the criticism of himself and the administration of his office, together with the entire administration of the parish. Defendant was the sheriff of the parish, which is usually considered a good paying office throughout the state; he, or his paper, had the school board contract, and he had the police jury contract; his suggestion, or the suggestion of his company, about the timber estimating contract, which covered a rather large expenditure of money, were sufficient to cause the intelligent voter to ask him concerning these things, particularly when he had written the voters a circular letter, in which he referred to them, and asked for the support of the people.

[6] All of these things would not be sufficient to justify the libel of an honest party; but we fail to find any libel in the two communications complained of by defendant, and offered by him as a justification for denouncing the plaintiff as "an assassin of character, a liar, and unworthy of the respect and esteem of decent and fair-minded people," for the reason that plaintiff in publishing the letters complained of by defendant did not publish any untruth concerning the defendant. The several questions and comments contained in the letters had sufficient bases in fact and truth to have authorized any taxpayer to have asked defendant about

them, as he was a member of the administration of parochial affairs which had done the several things referred to, particularly when defendant had written a letter presenting these various subjects for discussion. Defendant has failed to prove the truth or justification for his libelous charges against plaintiff, and he is liable in damages therefor.

[7] It will be presumed that the libelous language used by defendant against the plaintiff was malicious, and that he has damaged the latter, although no special damages may have been shown. Leesville is a small town, in which both plaintiff and defendant live, as respected citizens thereof, in the enjoyment of public office and in the esteem of their fellow townsmen. Nevertheless, damages in a substantial amount should be allowed the plaintiff in this case.

It is therefore ordered, adjudged, and decreed that the judgment appealed from in so far as it dismisses the suit of plaintiff be annulled, avoided, and reversed; and it is now ordered, adjudged, and decreed that there be judgment in favor of plaintiff and against defendant B. H. Lyons in the sum of $2,500, with costs in both courts.

PROVOSTY and O'NIELL, JJ., concur in the decree.

On Rehearing.

LECHE, J. Both the law and the facts of this case were again forcibly argued and clearly presented to this court by learned counsel. We are, however, still of the opinion that the conclusions announced in our former judgment are sustained by the evidence and the law applicable to this case. Defendant in his circular letter of March 20, 1914, invited criticism of his official conduct; that criticism was very severe, but when considered and weighed according to the principles laid down in the cases of Addington v. Times Pub. Co., 138 La. 731, 70

South. 784, Hall v. Ewing, 140 La. 908, 74 South. 190, and Egan v. Signal Pub. Co., 140 La. 1070, 74 South. 556, it is not libelous, and it did not excuse or justify the defendant in uttering and publishing on April 13, 1914, the poster or placard, the libelous character of which is beyond question.

We have, however, reached the conclusion that the damages awarded by us are, under the circumstances of this case, excessive, and that the ends of justice will be satisfied by reducing the amount of said damages to $500.

It is therefore ordered that our former judgment be amended by reducing the damages allowed to plaintiffs from $2,500 to $500, and as thus amended said judgment is reinstated and made final.

O'NIELL, J., concurs in the decree.