102 So.2d 433

James MADISON

v.

Nathan BOLTON et al.

No. 43257.

March 17, 1958.

Rehearing Denied May 26, 1958.

Malcolm E. Lafargue, Shreveport, for defendants-appellants.

Ralph Brewer, Jr., Baton Rouge, amicus curiæ.

1. That editorial, headed "High Handed Action by The Library Board President," read in its entirety as follows:

"The President of the Morehouse Parish Library Board draws no salary for his work in that connection, but he is partially responsible for the spending of the taxpayers' money in their efforts to obtain and retain volumned culture for the people at the least possible cost. His office does not give him any special powers to oust newspaper men from meetings of the Board, to hold secret or executive sessions or to otherwise act in a high handed manner.

Campbell & Campbell, by John T. Campbell, Minden, for plaintiff-appellee.

FOURNET, Chief Justice.

The plaintiff, James Madison, an attorney at law, residing and practicing his profession in the town of Bastrop, Morehouse Parish, Louisiana, claiming to have been damaged by the publication of a certain editorial in the Bastrop Daily Enterprise, of which the defendant Nathan Bolton is owner and publisher, and the defendant Matt Sheley at the time was editor and reporter, filed this suit in the district court seeking judgment against the defendants jointly, severally and in solido in the sum of $100,000, alleging that for many years he has been a reputable, respected and patriotic citizen, a business man, an attorney at law—and President of the Morehouse Parish Library Board, a public office of trust and honor in which he has served without pay; that on January 12, 1954, the defendants caused to be published an editorial[1]

"Mr. Madison has no doubt made a good president of the Board. He was at the helm when the beautiful new building of which every resident of the Parish is proud was built. But he didn't do it by himself. Everyone had a hand in it. In fact, Mr. Madison received just as much as he gave. He was paid approximately $13,000 for the lot the library now occupies and it was while he was a member of the Board.

"The Library Board has been more or less exclusive in its meetings, for the past year at least. It changes dates, has no set times for assembling and does pretty

reading in part: " * * * Mr. Madison has no doubt made a good president of the Board. He was at the helm when the beautiful new building of which every resident of the Parish is proud was built. But he didn't do it by himself. Everyone had a hand in it. *In fact, Mr. Madison received just as much as he gave. He was paid approximately $13,000 for the lot the library now occupies and it was while he was a member of the Board * * *"*, which editorial "exposes petitioner to disrepute, ridicule and contempt before the general public, particularly the citizenry of Morehouse Parish, his colleagues and those with whom he has served in other offices of trust;" that its meaning and implication were "that petitioner had used his public trust and position and influence as a member of and President of the Morehouse Parish Library Board for the purpose of enriching himself and gaining a personal profit for himself at the expense of the taxpayers of Morehouse Parish by selling the lot the Library now occupies to the Library Board or to the Police Jury for the use of the Library Board for an amount in excess of its cost to petitioner and of its true value. Said editorial implied and was intended to imply that petitioner had betrayed his trust as President of the Library Board and had used his position and influence as President of said Board to indirectly reap a profit for his services as a member of and President of the Morehouse Parish Library Board;" and that said publication "was done maliciously and for the purpose of injuring the good name, fame and reputation of petitioner;" that same was false, the true facts being that the lot was acquired on March 26, 1930, by Charles Snyder and George T. Madison for $14,000 cash, in the proportion of two-thirds to Snyder and one-third

well as it pleases. It spent over $70,000 last year, including quite a sum for the new building. It pays out more than $13,000 per year in salaries.

"The Board was given the full support of the Enterprise in the new building project, but the Enterprise is not going to sit idly by while the president of the Board vests himself with powers not enjoyed by any other president of any other body in Morehouse parish. Mr. Madison should, as an attorney, be well aware of the danger of secret meetings and whispered sessions behind closed doors. Even when they are innocent such meetings breed suspicion, and rightly so. Any public body which· is not ashamed of what it does should not need to go into secret sessions behind closed doors.

"Perhaps the president has misunderstood the duties and privileges of his office. Perhaps he is not aware of the fact that secret sessions, masquerading under the flimsy disguise of 'executive sessions' are no longer popular. In fact they are quite unpopular and will not be tolerated in any community which wishes to be completely democratic and devoid of dictatorship in even its simplest form.

"The Enterprise trusts that in the future, the Library Board will hold only 'open' meetings and that newsmen and any private citizen who chooses might sit in throughout the entire meeting. * * * That they get to stay for the main course—the meat—as well as the appetizer."

to Madison, and on the following day George T. Madison sold to plaintiff an undivided one-sixth interest for $2,333.33 cash; that sixteen years later, on March 5, 1946, the lot was acquired by the Police Jury of Morehouse Parish from those same persons or their heirs (Mr. Snyder having died in the interval) for $13,500 cash, although the true value was in excess of that amount; that actually the said sale resulted in a loss to the owners on their original investment, the net amount of that loss being $11,137.10; [2] that those facts were known or could have been ascertained by defendants; that the accusations, inferences, insinuations and innuendos made in the said editorial "constituted an unwarranted, scurrilous, false, malicious and libelous attack on petitioner's personal character and reputation for integrity, honesty and patriotism and were made for the express purpose of bringing him into disrepute and contempt before the public, and as a direct result thereof he has been held up to public ridicule, defamed, accused of immorality, corruption in office and selfish motives, all of which caused him great humiliation and mental suffering." Assessed as damage, for humiliation and mental suffering resulting from the publication of the alleged libel, is the sum of $10,000; for "injury to his reputation, personal and professional," an amount of $20,000; and as additional compensatory damages for injury done him "in the loss of public confidence," the sum of $70,000.

The defendants first sought dismissal of plaintiff's suit based on an exception of no cause or right of action, and, by supplemental and amended exception of no right of action, asserted that plaintiff, having admitted he held a public office, was governed by the laws of Louisiana found in R.S. 42:1 et seq. (applicable to Public Officers and Employees), in R.S. 25:211 et seq. (titled "Parish and Municipal Libraries"), and in Article 740.140 of the Criminal Code (dealing with the crime of public contract fraud); that the editorial was published in connection with a news article in the same edition under the heading "Newsman Ejected from Library Board Meeting," which article is material and relevant

---

2. The estimated loss is computed as follows:

| | |
|---|---:|
| Cost of lot in 1930 | $ 14,000.00 |
| State and Parish taxes, 1930–1945 incl. | 1,134.94 |
| Municipal taxes, City of Bastrop, 1930–1945 inc. | 542.16 |
| Int. on orig. investment at 4% per annum to date sale | 8,960.00 |
| Total | $ 24,637.10 |
| Amount received for lot in 1946 | 13,500.00 |
| Net Loss | $ 11,137.10 |

to the issues involved; that the portion of the editorial quoted in the petition is susceptible of explanation by reference to the news article and also to particular transactions of plaintiff in connection with the sale of the lot, as outlined in the petition and shown in attached exhibits; that the quoted words of the editorial "are not libelous per se or otherwise," and were "made from no wrong motives or ill will towards plaintiff," but the editorial "simply was one dealing with a matter of special public interest" and as such "was privileged as a comment on a news matter of general public interest concerning the activities of public bodies and their officials, and is here specially so pleaded;" that the editorial was made in good faith and without malice, and "falls within the doctrine of qualified privilege respecting fair comment and criticism of public officers and men in public light," and that plaintiff, because of his own allegations and admissions, is himself at fault and cannot recover. The exceptions of defendant Bolton were ultimately overruled, those of Sheley were referred to the merits, and the matters upon which the exceptions were founded were again pleaded in defendants' separate answers, with additional averments by Bolton that if any injury or damage has come to plaintiff by reason of the editorial, it is because of the instant suit and plaintiff's interpretation in a light derogatory to himself, but never contemplated by defendant; that all of the facts

concerning the meetings of the Library Board could not be ascertained because the Board failed to give public notice of its official meetings, refused to permit a reporter from the Daily Enterprise to be present at a so-called "executive meeting," and it was not until the opinion of the district attorney was sought that he (Bolton) was able to secure from the Board a copy of the budget; that at the time when consideration was being given to acquiring property on which to construct a library building, the plaintiff, on February 5, 1946, "appeared in the capacity of President of said Board before the Morehouse Parish Police Jury in connection with the purchase of a lot owned by him and others which the said Board had selected to purchase;" and "appeared a second time before the Morehouse Parish Police Jury on March 5, 1946, in the capacity of President of the Morehouse Parish Library Board in connection with the sale of the property owned by himself and others to the said Board." Sheley's answer contained a more detailed averment concerning the Library Board's meeting of January 11, 1954 (the day before the editorial appeared), "which he chanced to stumble on, as a reporter for the Bastrop Daily News;" and it was while he was attending that meeting that the plaintiff said "We are going into executive session to discuss the budget, and Mr. Sheley I will have to ask you to leave and wait outside"—whereupon defendant Sheley re-

turned to the office of the newspaper; that it was only after several unsuccessful attempts to obtain a copy of the budget that he, Sheley, was notified by the Secretary of the Library Board that he might pick up a copy at the Board's office; there he found, among other members present, the plaintiff, who complained about the content of the news story and, as to the editorial, said only that others besides himself owned the lot which had been sold to the Library Board, asking that correction be made; that plaintiff's request in that respect was complied with by a correction in an Editor's note of the issue of the following day, Tuesday, January 19, 1954. On the basis of their respective answers, the defendants prayed for judgment rejecting plaintiff's demand and dismissing his suit.

The case proceeded to trial on the merits and the district judge, having reached the conclusion after analysis of the facts and application of legal principles that the objected-to portion of the editorial embodied a false statement of fact and therefore could not be classed as fair comment, and that the said statement "may be regarded as defamatory without the aid of extrinsic proof," rendering it libelous per se, which carries a presumption of malice, rendered judgment for plaintiff and against defendants jointly, severally, and in solido for the sum of $7,500, with legal interest from judicial demand. From that judgment the de-

fendants appealed, and the plaintiff has answered the appeal, urging that the award is inadequate and asking that the sum be increased.

In a general and comprehensive sense, libel is the defamation of a person by the publication of any false and unprivileged writing which tends to expose him to contempt, hatred, ridicule or obloquy; or which causes him to be shunned or avoided; or which has a tendency to deprive him of the benefits of public confidence or injure him in his occupation; and includes almost any language which upon its face has a natural tendency to injure the person's reputation, either generally or with respect to his occupation. Libel is actionable under Article 2315 of the Civil Code, declaring that every act of man causing damage to another obliges him by whose fault it happened to repair it (Vicknair v. Daily States Pub. Co., 153 La. 677, 681, 96 So. 529, and cases therein cited; Wisemore v. First Nat. Life Ins. Co., 190 La. 1011, 183 So. 247). A mere insinuation is as actionable as a positive assertion, if the meaning is plain; and if the words used, when taken in their ordinary acceptation, convey a degrading imputation, no matter how indirectly, they are libelous— it matters not how artfully their meaning is concealed or disguised.[3] Words charged to be libelous have been classified as those that are susceptible of a defamatory meaning and those that are indisputably defama-

3. 33 Am.Jur. 43, Verbo Libel and Slander, Sec. 9.

tory on their face. In the latter category they are actionable per se; they impute to the person the commission of a crime or subject him to public ridicule, ignominy or disgrace, and are susceptible of but one meaning.[4] Words not actionable per se fall short of those requirements, and are found in numerous categories, among which are words that are actionable only in consequence of extrinsic facts, in which case the surrounding circumstances and conditions must be taken into account to determine the matter, or statements that contain language which unjustifiably tends to injure the reputation of a person, or reflect shame and disgrace upon him. The intent and meaning of an alleged defamatory statement must be gathered not only from the words singled out as libelous, but from the context as well, and the true meaning must be ascertained from a consideration of all parts of the statement as well as the circumstances of its publication.[5] "The test is the effect the article is fairly calculated to produce, the impression it would naturally engender, in the minds of the average persons among whom it is intended to circulate." Boyer v. Pitt Pub. Co., 324 Pa. 154, 188 A. 203, 204.

Valid defenses to a civil suit for libel, in a case such as this, are (a) truth of the contents of the alleged libelous matter (Pool v. Gaudin, 209 La. 218, 24 So.2d 383; Kennedy v. Item Company, 197 La. 1050, 3 So.2d 175; Otero v. Ewing, 165 La. 398, 115 So. 633; Smith v. Lyons, 142 La. 975, 77 So. 896, L.R.A.1918E, 1; Hall v. Ewing, 140 La. 907, 74 So. 190; Hawkins v. New Orleans Printing & Publishing Co., 29 La.Ann. 134; Perret v. New Orleans Times Newspaper, 25 La. Ann. 170; R.S. 13:3602 (formerly R.S. of 1870, § 3640), where the defense is termed a plea "In justification;" see, also, La. Const. of 1921, Art. 19, Sec. 9); (b) fair comment and criticism, whether constructive or derogatory, in the absence of malice, concerning the acts and conduct of persons in public life on matters of public concern —sometimes termed the doctrine of qualified privilege—but not an available defense where applied to a false statement of fact; it is a right of comment which extends only to the official acts of a public officer, not to his character or reputation, nor to him as an individual.[6] Cadro v. Plaquemines Gazette, Inc., 202 La. 1, 11 So.2d 10; Martin v. Markley, 202 La. 291, 11 So.2d

4. See 33 Am.Jur. 40, Verbo Libel and Slander, Sec. 5.

5. 33 Am.Jur., Verbo Libel and Slander, 99–100, Secs. 85, 87; 65–66, Sec. 45; Martin v. Markley, 202 La. 291, 11 So.2d 593.

6. In Williams v. Hicks Printing Co., 159 Wis. 90, 150 N.W. 183, 188, the Court declared that "Conditional privilege as re-

gards newspaper activity does not go beyond fair criticism in respect to the relations of persons to the public and report of facts. It does not extend to false statements of fact or unjust inferences, nor taunts, nor contemptuous and insulting phrases." And in Lindsey v. Evening Journal Ass'n, 10 N.J.Misc. 1275,

593; Kennedy v. Item Co., 213 La. 347, 34 So.2d 886, and authorities therein cited; Otero v. Ewing, 162 La. 453, 110 So. 648, 56 A.L.R. 249; 110 A.L.R. 412, 413; 53 C.J.S. Verbo Libel and Slander § 131 (b) (3), p. 213. And lastly, (c) the doctrine of "privilege" in its true sense—a concept which has its basis in broad principles of public policy. In the law of libel and slander the term "privileged" is applied to a statement which, except for the occasion on which or the circumstances under which it was made, would be defamatory and actionable.[7] It should be apparent that

under the rule of fair comment and criticism, there is no need for the law of "privilege" to shield the statements since they are made with an honest purpose, without malice, based on facts, are restricted to a man's acts or works, must not attack him in his private character nor convey imputations of an evil sort except so far as the facts, truly stated, warrant the imputation; whereas in the case of "privileged" statements, the words are defamatory but the defamation is excused or justified by reason of the occasion.[8] Such communications are sometimes said to be made in pursuance

163 A. 245, 248, the Court aptly observed that "There is no doubt that the public acts of a public man may lawfully be made the subject of fair comment or criticism, not only by the press, but by all members of the public. But the distinction cannot be too clearly borne in mind between comment and criticism and allegations of fact, such as that disgraceful acts have been committed or discreditable language used. *It is one thing to comment upon or criticize, even with severity, the acknowledged or proven acts of a public man, and quite another to assert that he has been guilty of particular acts of misconduct.* It is settled that newspapers as such have no peculiar privilege, and it is equally settled that the privilege of comment and criticism on matters of public interest, does not extend to false statements." (Emphasis supplied.)

7. It is generally recognized that privileged communications are divided into two general classes, (a) those in which the privilege is termed "absolute," in respect of which no remedy can be had in a civil action, however hard it may bear upon a person who claims to be injured thereby, and even though it may have been made maliciously—a class of privileged communications narrow in scope and

practically limited to legislative and judicial proceedings and other acts of state, and (b) those in which the privilege is "qualified" or "conditional," the essential elements of which are good faith, an interest to be upheld and a statement limited in scope to this purpose, a proper occasion, and publication in the proper manner and to proper parties only. 33 Am.Jur. 123–126, Verbo Libel and Slander, Secs. 124–126; Berot v. Porte, 144 La. 805, 81 So. 323, 3 A.L.R. 1651.

8. See Newell, The Law of Slander and Libel (4th Ed. 1924) 380, Sec. 341, where it is said that the underlying principle of public policy is "more especially the case with absolute privilege, where the interests and the necessities of society require that the time and occasion of the publication or utterance, even though it be both false and malicious, shall protect the defamer from all liability to prosecution for the sake of the public good." On the other hand, the author points out that "Qualified privilege exists in a much larger number of cases. * * * The occasion on which the communication was made rebuts the inference of malice prima facie arising from a statement prejudicial to the character of the plaintiff * * *."

of a duty owed to society, an example being charges against public officials; but to qualify as "privileged" these must be prepared bona fide with a view to prevent or punish some public abuse, and provided they do not meet the objection of having been made maliciously and without probable cause;[9] and while the great weight of authority supports the view that publications concerning political matters, public officers, and candidates for office are entitled to a measurable privilege by reason of the public interest involved, there are recognized limitations on the rule, foremost among these being that the statements must not be motivated by actual malice. On the one hand there are cases in which the public benefits of free discussion are so great that privilege must be admitted, even though individual injury may be serious, "the one overshadowing the other to such a degree that only the public interest can be regarded when it appears that the discussion or publication has been in good faith:"[10] on the other hand, persons holding or aspiring to public office are not wholly without the protection of the law, since it is generally held that accusations of dishonesty or corruption and imputations of dereliction of duty or misconduct in office are not privileged.[11] This Court, in Otero v. Ewing, declared: "A person by becoming a candidate for office does not offer himself, his good name, reputation, and character as a target for any and all malignant, infamous, and slanderous accusations to be hurled at him and pampered to the public. A newspaper or an individual who engages in the circulation or publication of libelous matter under such circumstances is just as amenable to the law and to the party aggrieved as such newspaper or person would be in a libel against an individual who was not a candidate." 162 La. 453, 462, 110 So. 648, 652.

The issues raised by the pleadings and the facts developed by the record are these: (a) Does the editorial of January 12, 1954, constitute a libelous attack upon plaintiff's character and reputation? (b) Since truth is a defense to any action for libel, are the inferences necessarily drawn therefrom true? (c) Were the charges therein made and necessarily implied justified as fair comment and criticism of a public official?

9. See Odgers' Libel and Slander. from the Second English Edition (1891) 170, where it is said: " 'This privilege, however, must not be abused; for if such a communication be made maliciously and without probable cause, the pretence under which it is made, instead of furnishing a defence, will aggravate the case of the defendant * * *. And a defendant will be taken to have acted maliciously, if he eagerly seizes on some slight and frivolous matter, and without any inquiry into the merits, without even satisfying himself that the account of the matter that has reached him is correct, hastily concludes that a great public scandal has been brought to light which calls for the immediate intervention of the Crown * * *.' "

10. Foster v. Scripps, 1878, 39 Mich. 376, 383, 33 Am.Rep. 403.

11. 33 Am.Jur. 161–163, Verbo Libel and Slander, Sec. 169.

(d) Were the charges "privileged," so as to provide the defendants with immunity from an action in damages therefor? And, in the event that liability on the part of defendants is found to exist, (e) the quantum of damages.

There is no merit in the defendants' contention that plaintiff committed public contract fraud as defined in R.S. 14:140;[12] that article of our Criminal Code limits the crime to cases in which the officer does some affirmative act, such as voting or using his influence to secure the expenditure of public funds to himself.[13] A review of the record readily discloses, as will be hereafter shown, that plaintiff did not vote for the acquisition of the lot, did not persuade or influence any member of the Board to purchase the property, nor undertake so to do, either in or out of session, and made it clear to the Police Jury, after that body had voted to acquire the lot, that there was no obligation to complete the purchase.

The evidence adduced shows that the plaintiff—who by general concensus enjoys an excellent reputation not only in Morehouse Parish but throughout the State and elsewhere, and who has held many positions of honor and respect—in March of 1930 purchased from George T. Madison for the price of $2,333.33 a one-sixth interest in the parcel subsequently acquired by the Police Jury as a library site; it measures 90 x 150 feet and fronts on the Court Square of Bastrop. George Madison and his co-purchaser, Charles Snyder, in the same year had paid $14,000 for the lot. As early as 1940 the Library Board began to investigate property with a view to erecting a permanent home, and in 1946 its president, the plaintiff (who had been appointed a member of the Board in 1943 by the Police Jury of

---

12. "Public contract fraud is committed: (1) When any public officer or public employee shall use his power or position as such officer or employee to secure any expenditure of public funds to himself, or to any partnership of which he is a member, or to any corporation of which he is an officer, stockholder or director; or (2) When any member of any public board, body, or commission charged with the custody, control or expenditure of any public funds votes for or uses his influence to secure any expenditure of such public funds to himself, or to any partnership of which he is a member or to any corporation of which he is an officer, director, or stockholder.

"The fact that an expenditure has been made to any party named in this article, or to any partnership of which he is a member, or to any corporation, of which he is an officer, stockholder or director, shall be presumptive evidence that such person has used his power, position or influence to secure such expenditure.

"Whoever commits the crime of Public Contract Fraud shall be fined not more than one thousand dollars, or imprisoned, with or without hard labor, for not more than two years, or both."

13. See State v. Abernathy, 1940, 194 La. 559, 194 So. 19; R.S. 14:140 as presently composed, its source being Act 43 of 1942, is a rewriting of the former statute on the subject with an express codification of the rule of the Abernathy case.

Morehouse Parish) was requested by other members to ascertain if the property then occupied by the library on a rental basis could be purchased; his report was that it could not, but that the adjoining vacant lot could be acquired for the price of $13,500— although all the owners were not in favor of the sale because they felt the property could be sold for a larger sum. When the Library Board voted on whether they should purchase the indicated lot, the (plaintiff) president recused himself and refused to vote on the matter. The Board decided to purchase the property and authorized their president to appear before the Police Jury with their recommendations (the Police Jury alone having authority to make the purchase); the plaintiff did so, in company with other members of the Board, and presented the recommendations of the Library Board; and upon motion, duly adopted on February 5, 1946, the Police Jury voted to purchase the lot for $13,500. The information was immediately published in the Enterprise, with notation of the ownership by the Charles Snyder estate, "with George T. Madison and James Madison each having a sixth interest in the property," and a quotation attributed to Board members stating that "prices were rising and they felt they could do no better, location considered." A week later two other items concerning the proposed sale appeared in the Enterprise, in one of which mention was made that the purchase money

consisted of funds derived from the severance tax allocated to the parish by the Police Jury, and in the other was contained the remark that "In connection with the library story last week we might better have stated that the land sold for $150 a front foot as compared with $100 a front foot alongside it. The owners of the property, however, could have sold the land for as much or more to some business house. Land values in Bastrop seem to be really on the upgrade." The plaintiff, in his capacity as President of the Library Board, thereupon returned to the Police Jury and advised that, in view of the fact there appeared to be some criticism concerning the price, they were at liberty to withdraw from their agreement to purchase. Instead of withdrawing, the Police Jury unanimously adopted a formal resolution authorizing the acquisition at the agreed price; and title was conveyed to the Police Jury on March 5, 1946.

Some six years after that purchase (i. e., in 1952) the Police Jury ordered an election to levy a tax to provide funds for the construction of a building on the lot, whereupon those who opposed placing the library on the Court Square (a view which the Enterprise had consistently expressed) renewed their opposition to construction of the building at that location on grounds that a library should not be in the business district but on less valuable property elsewhere and the lot should be reserved for

commercial expansion since it was the last vacant property on the Square. In a newspaper editorial[14] the defendant Bolton took that view, remarking that "In fact, we commented editorially in opposition to the proposal to buy the lot at a price of $13,500 several years ago," and suggesting that the lot be sold because "We believe the board could more than double its original investment," since there was already one firm offer of $9,000 for one-third of the frontage, or 30 feet. The tax was nevertheless voted and in due course the library was constructed. It was completed and occupied in 1953, and on October 17th of that year the defendant Bolton was advised by letter[15] that use of the library lot to get newsprint into the building occupied by the newspaper (adjoining to the rear) would no longer be permitted.

On January 11, 1954, the Library Board met for the purpose, among other things, of adopting a budget. The evidence discloses that the newspaper was not notified of the time and place of this meeting, and by accident the defendant Sheley learned of it and attended in his capacity of re-

porter. While the meeting was in progress the plaintiff twice remarked that they were going into executive session and then, with the same explanation, requested defendant Sheley (the only non-member present) to wait outside for a few minutes. He did not wait, but returned to the newspaper office and on the following day the paper carried on its front page, under the headline "Newsman Ejected From Library Board Meeting," an account of the happenings, and on page 2 of the same edition was the editorial, titled "High Handed Action by the Library Board President," reproduced in footnote 1 herein, the contents of which form the basis of the instant suit. The issue of a week later, January 19, 1954, carried an item concerning the budget of the Library Board, in the course of which there appeared an "Editor's Note" followed by this paragraph: "The Daily Enterprise stated in one of its editorials that President James Madison of the Board got more out of the library than he had given because it sold the lot on which the building now stands for the sum of $13,000. Actually Mr. Madison owned only a part interest in the lot. Mr. Madison asked this clar-

14. This editorial appeared in The Clarion, a newspaper of Morehouse Parish also owned by Mr. Bolton.

15. The letter read as follows: ·
"Dear Mr. Bolton: At the regular monthly meeting of the Library board it was decided that the lot should be beautified, and shrubs planted, and, therefore, it will be necessary for you to make other arrangements for getting your newsprint into the building. When the shrubs are

planted it will take in a portion of the library lot which you are now using.
"In order that it may not work a hardship on you, we will permit you to use your same arrangement for getting the newsprint into the building until December 1st of this year, but after that you are not to use the lot as you have in the past. This will give you ample time to make some other arrangements."

ification and the Enterprise is glad to make it." [16] Meanwhile, the opinion of the district attorney of the Parish having been sought, his views were published on whether the budget of the Library should be made available to the press and public, and whether it formed proper material for an executive session, with numerous quotations in bold face indent type of statutes of our State concerned in general with meetings of public boards or bodies. The Enterprise also carried a reprint from the January 23, 1954, edition of Editor and Publisher magazine commenting editorially on the incident as gleaned from the newspaper account and on "self-appointed guardians of 'national security' who refuse to let the public business he revealed." The matter was terminated, so far as editorials were concerned, with the remarks: "We would like to drop the subject—to bury the hatchet, * * * But the Enterprise will only bury the hatchet if the board does away with executive sessions."

 The language used in the editorial was, we think, clearly defamatory; while it did not charge the plaintiff with the commission of a crime, nor precisely subject him to public ridicule or disgrace, it nevertheless conveyed a degrading imputation by innuendo and insinuation that the plain-

tiff had profited by his position of honor and trust to advance his personal fortunes. If this could be doubted, the so-called "retraction" of a week later made crystal clear exactly what was meant; by its own interpretation, *"The Daily Enterprise stated in one of its editorials that President James Madison of the Board GOT MORE out of the library than he had given because it sold the lot on which the building now stands for the sum of $13,000. * * *"* (Italics and capitals supplied.) The effect the defamatory words were calculated to produce and the impression they would naturally engender in the minds of the people in Bastrop and Morehouse Parish where the paper circulated were that the plaintiff, though he drew no salary as President of the Board, was not unrewarded for his endeavors, having received "just as much as he gave"—as witness the fact that, while a member of the Board, he was paid approximately $13,000 for the lot on which the library stands. Implicit in the words is the thought that plaintiff used his position of honor and influence as President to gain a personal profit at the expense of the taxpayers. It cannot be successfully disputed that words bearing such an inference tended to deprive the plaintiff of the benefits of public confidence and to in-

16. Beginning with the issue of January 12 and continuing through January 28, as shown by exhibits in the record, in almost every issue of the paper, under the guise of news items or as subject matter for defendant Bolton's column "Around Town with Nota Bene," an issue was made and kept alive concerning secret meetings and closed sessions.

jure him in his occupation of attorney, and that, if untrue, were libelous.

There is no attempt on the part of the defendants to assert as a defense the truth of the insinuation; their reliance is placed on special pleas (a) of fair comment and criticism, and (b) that the editorial was "privileged" as a comment on a newsmatter of general public interest concerning the activities of public bodies and their officers.

The former plea is clearly not available to defendants in view of the falsity of the implications of dishonesty, abuse of public trust, and corrupt influence for private gain. As this Court said in Levert v. Daily States Pub. Co., "The privilege of fair and reasonable criticism of public men does not embrace the right * * * to falsely impute to them malfeasance or misconduct in office." 123 La. 594, 609, 49 So. 206, 211, 23 L.R.A.,N.S., 726. An able exposition of the rule is found in Triggs v. Sun Printing & Publishing Ass'n, 179 N.Y. 144, 71 N.E. 739, 742, 66 L.R.A. 612, where it is said: "While every one has a right to comment on matters of public interest, so long as one does so fairly, with an honest purpose, and not intemperately and maliciously, although the publication is made to the general public by means of a newspaper, yet what is privileged is criticism, but other defamatory statements; and, if a person takes upon himself to allege matters otherwise actionable, he will not be privileged, however honest his motives, if those allegations are

not true. * * * The single purpose of the rule permitting fair and honest criticism is that it promotes the public good, enables the people to discern right from wrong, encourages merit, and firmly condemns and exposes the charlatan and the cheat, and hence is based upon public policy. *The distinction between criticism and defamation is that criticism deals only with such things as invite public attention or call for public comment, and does not follow a public man into his private life, or pry into his domestic concerns. It never attacks the individual, but only his work * * *.*"

Nor can the special plea of "privilege" be invoked. This Court has had occasion to comment on the type of privilege here claimed by defendants, observing that "it falls within the class of qualified privileged communications where the occasion on which it was made rebuts the inference prima facie arising from a statement prejudicial to the character or reputation of plaintiff, and puts the burden on him to prove that there was malice in fact, that the defendant was actuated by motives of personal spite or ill will, independent of the occasion on which the communication was made." Berot v. Porte, 144 La. 805, 81 So. 323, 3 A.L.R. 1651. The plea has no place under the facts of this case because the subject matter of the editorial was completely foreign to the defamatory words. The editorial purported to condemn executive and secret meetings of the Library Board—as pointed up by the news story—and there

was no conceivable connection between those comments and the sale of the lot by the plaintiff to the Board some eight years previously. Just why this libelous accusation should have been injected at this particular time—whether the result of pique or ill will, or for some other reason—can only be surmised, and an expression on the matter would serve no useful purpose.

Damages were fixed by the trial judge in amount of $7,500. Defendants maintain this is excessive because the evidence shows that the plaintiff has maintained his standing in the community and has suffered no injury; the plaintiff for his part urges that the sum should be increased "to at least $25,000." In the case of Kennedy v. Item Co., 213 La. 347, 373, 34 So.2d 886, 895, this Court aptly observed that "in fixing an amount we must, under the jurisprudence, take into consideration the severity of the charges, the motives of the publisher, as well as the position of influence enjoyed by the newspaper and the extent of its circulation. We must also take into consideration the fact that the plaintiff, in seeking vindication by peaceful and orderly means, has had to bear with his injured feelings during this long and protracted litigation * * * as well as the time, efforts, and expense expended by him in connection therewith. Besides, although it is as a practical matter almost an impossibility to envision the actual, both present and future, effect this editorial will have on the plaintiff's business and profession, we must consider this in our arrival at the proper amount of damages to award him, for it is well known that such matters have an uncanny way of coming to light through one medium or another and confronting the victim in the future whenever he is being considered, whether in a business venture or in a matter of public or private importance." It is noted that the district judge used the above pronouncement in arriving at the amount assessed as damages; after a careful review of the record we are not disposed to disturb his judgment.

For the reasons assigned, the judgment appealed from is affirmed.

HAMITER, J., concurs in the decree.

102 So.2d 444