[No. 36894. Department One. February 6, 1964.]

PHILIP C. PITTS *et al., Respondents,* v. SPOKANE CHRONICLE COMPANY, *Appellant.*\*

\*Reported in 388 P. (2d) 976.

*Witherspoon, Kelley, Davenport & Toole,* for appellant.

*Donald L. Burcham,* for respondents.

ROSELLINI, J.—Plaintiffs, claiming libel, brought this action against a daily newspaper. By answer, the newspaper admitted publishing the statements, but denied that the statements were in any way defamatory or that plaintiffs suffered any loss or damage from them. From a judgment for the plaintiffs in the sum of $2,000 after trial to the court, the defendant appeals.

On two separate occasions, the questions of law raised by the pleadings were considered *in extenso* by different judges. Judge Raymond F. Kelly ruled upon defendant's motion for summary judgment, and favored the record with his formal memorandum opinion—to which we will later refer—in denying the motion. Judge George H. Freese, who tried the cause on its merits, likewise filed his memorandum opinion in awarding plaintiffs damages.

We now adopt and set forth the major part of the learned trial judge's memorandum opinion:

"Philip C. Pitts was divorced from his former wife, Hazel Pitts, on the 3rd day of February, 1960 in Bonner County, Idaho. In September, 1960 he married Donna Pitts, his present wife, and since his second marriage resided in Spokane, Washington and had custody of two of his minor children. Donna Pitts also had a child by her former marriage. Philip C. Pitts and Donna Pitts and the three children formed a family unit, which was apparently held in high esteem in their neighborhood, and enjoyed the company and social relations of their neighbors, as well as his fellow employees.

"Prior to April 21, 1961 Philip C. Pitts commenced an action in the Superior Court of Spokane County for the modification of his divorce decree to the effect that the custody of the youngest child be awarded to him. On

April 21, 1961 the defendant, Spokane Chronicle Company, printed the following:

"'Brief City News—Records'

"'Divorce Granted

"'Hazel M. Pitts from Philip Pitts'

"The printing of this statement was a mistake on behalf of the defendant, Spokane Chronicle Company. The reporter evidently failed to check the documents that were filed, and there was no malice or ill-will involved in any way. However, the publication gave the impression, to those who read it, that the plaintiff, Philip C. Pitts, had not been divorced from his former wife, Hazel M. Pitts, until about April 21, 1961, and that his marriage to Donna Pitts, his present wife, was illegal, and that he was a bigamist. Several of their friends called both Mr. and Mrs. Pitts by telephone and made sarcastic remarks about them being bigamists. One of their neighbor families refused to let the Pitts' children play with their children, and one of their other friends, a Mrs. Hill, was rather indignant about the entire matter, refusing to take any explanation that was offered by the Pitts. The fellow employees of Mr. Pitts would discuss this matter in his presence at their place of employment.

"The plaintiffs have not alleged any special damages and have not proved any special damages, and are only asking for general damages which they sustained by way of humiliation and loss of association with their friends. The evidence introduced was sufficient to show that the plaintiffs were damaged generally by this publication, which apparently was believed to be the truth by several of their friends. The evidence will also bear out that this damage was substantiated.

"The only question to be determined is whether or not the publication was libelous per se, so that the plaintiffs can recover general damages without alleging and proving special damages. The question whether or not a publication of the nature as the one involved is libelous per se becomes a matter of fact depending upon the facts and circumstances, and the result that said publication would have. In the instance case, if Mr. Pitts had not been remarried, no harm would have been done, but since he was remarried and lived in a respectable community and kept three young children in his home, and enjoyed good social relationship with his neighbors, and was respected by his fellow em-

ployees, this publication would do him some harm, or cause him some general damages.

"The facts as set forth by the evidence are sufficient to make the publication libelous per se, and the plaintiffs are, therefore, entitled to general damages. The defendant immediately, when the matter was called to its attention, published a correction, and did everything that was in its power to mitigate the damages done. The situation has been explained to at least most of the friends and acquaintances of the plaintiffs. The damage suffered by the plaintiffs is not great. However, the article caused plaintiffs considerable embarrassment and humiliation."

■ As we have seen, the trial judge had the assistance of Judge Kelly's memorandum opinion filed earlier in the cause in ruling upon the motion for summary judgment, and we adopt and set forth the following from it:

"Defendant's theory, as above indicated, is that the quoted writing is not libelous *per se* and, no special damages having been pleaded, no action lies on the theory of a libel *per quod.*

"I have been unable to find, from the many authorities cited, that the Supreme Court of this state has ever passed upon a factual situation such as this. The article admittedly was erroneous and false. Standing alone, and to the average reader, it obviously contains nothing of a libelous nature as we commonly understand the term. However, there inhere in several of our Supreme Court cases the thought and the indication that an article may afford a right of action for libel *per se* depending upon the surrounding circumstances and the meaning conveyed to those who read the article.

" . . .

"All counsel have referred to the case of *Purvis v. Bremer's*, 54 Wn. (2d) 743 (1959). This case lends support to the observation made by the Court above relative to the consideration of extrinsic circumstances in determining the fact of the libel *per se.* . . . our Supreme Court said, at page 752:

" 'However, there seems to be an erroneous impression that, to be libelous *per se,* the statements in a publication must be so clearly defamatory that it ceases to be a question of fact for the jury, and is a matter concerning which there can be no difference of opinion among reasonable men, and becomes a question of law to be determined by the court.

To this impression we have contributed with statements that whether a writing is libelous *per se* is a matter of law. . . .

" 'Like most general statements, our statement that whether a writing is libelous *per se* is a matter of law to be determined by the court, is subject to exceptions. Where the definition of what is libelous *per se* goes far beyond the specifics of a charge of crime, or of unchastity in a woman, into the more nebulous area of what exposes a person to hatred, contempt, ridicule or obloquy, or deprives him of public confidence or social intercourse, the matter of what constitutes libel *per se* becomes, in many instances, a question of fact for the jury. This is particularly true where the words relied on as libelous *per se* depend upon innuendo or upon extrinsic circumstances *such as where they were published and who read them.* . . .' "

As is noted above, we are dealing here with words which are in themselves harmless, but, taken in the light of extrinsic circumstances can well be taken to be defamatory. In many cases, words which are innocent, if considered alone, have been held to be defamatory by reason of extrinsic facts even though such facts were unknown to the publisher. 33 Am. Jur., Libel and Slander § 85; *Pavesich v. New England Life Ins. Co.*, 122 Ga. 190, 50 S.E. 68; *Hughes v. Samuels Bros.*, 179 Iowa 1077, 159 N.W. 589; *Sydney v. Macfadden Newspaper Pub. Corp.*, 242 N.Y. 208, 151 N.E. 209, 44 A.L.R. 1419; *Madison v. Bolton*, 234 La. 997, 102 So. (2d) 433.

We said, in *Ziebell v. Lumbermens Printing Co.*, 14 Wn. (2d) 261, 127 P. (2d) 677:

" . . . It is proper to allege in the complaint that the words were published of and concerning the plaintiff and with reference to extrinsic circumstances, upon which their peculiar applicability to the plaintiff depends. Words which are harmless in themselves may be defamatory in the light of surrounding circumstances. . . . "

Our thinking seems to be quite close to the views of the judges in England. *Cassidy v. Daily Mirror Newspapers, Ltd.*, 2 (1929) K.B. 331, reported in this country in 69 A.L.R. 720, shows this. The plaintiff, Mildred Anna Cassidy, brought action against the Daily Mirror for publication of

words and pictures defamatory only in the light of extrinsic facts. We take the facts from the opinion by Scrutton, L.J.:

" . . . A man named Cassidy, who for some reason also called himself Corrigan and described himself as a General in the Mexican Army, was married to a lady who also called herself Mrs. Cassidy or Mrs. Corrigan. Her husband occasionally came and stayed with her at her flat, and her acquaintances met him. Cassidy achieved some notoriety in racing circles and in indiscriminate relations with women, and at a race meeting he posed, in company with a lady, to a racing photographer, to whom he said he was engaged to marry the lady and the photographer might announce it. The photographer without any further inquiry, sent the photograph to the Daily Mirror with an inscription: 'Mr. M. Corrigan, the race horse owner, and Miss X'—I omit the name—'whose engagement has been announced,' and the Daily Mirror published the photograph and inscription. This paper was read by the female acquaintances of Mrs. Cassidy or Mrs. Corrigan, who gave evidence that they understood from it that that lady was not married to Mr. M. Corrigan and had no legal right to take his name, and that they formed a bad opinion of her in consequence. Mrs. Cassidy accordingly brought an action for libel against the newspaper setting out these words with an innuendo, meaning thereby that the plaintiff was an immoral woman who had cohabited with Corrigan without being married to him."

Sustaining a verdict for 500 pounds sterling, the court said in analogy:

" . . . to say that A is a single man or a bachelor may be capable of a defamatory meaning if published to persons who know a lady who passes as Mrs. A and whom A visits. As Lord Blackburn says in *Henty's* case [L.R. 7 App. Cas. 741, 771]: 'There are no words so plain that they may not be published with reference to such circumstances, and to such persons knowing these circumstances, as to convey a meaning very different from that which would be understood from the same words used under different circumstances,' or, as Cotton L.J. said in the same case in the Court of Appeal [L.R. 5 C.P. Div. 514, 536]: 'One must consider, not what the words are, but what conclusion could reasonably be drawn from it, as a man who issues such a document is answerable not only for the terms of it but also for the

conclusion and meaning which persons will reasonably draw from and put upon the document.' . . ."

And:

"In my view the words published were capable of the meaning 'Corrigan is a single man,' and were published to people who knew the plaintiff professed to be married to Corrigan; it was for the jury to say whether those people could reasonably draw the inference that the so-called Mrs. Corrigan was in fact living in immoral cohabitation with Corrigan, and I do not think their finding should be interfered with."

Then, in ruling that knowledge on the publisher's part that the words might be deemed defamatory is not an essential ingredient, or that the publisher might not even know of the existence of the person defamed, the court said:

" . . . If he publishes words reasonably capable of being read as relating directly or indirectly to A and, to those who know the facts about A, capable of a defamatory meaning, he must take the consequences of the defamatory inferences reasonably drawn from his words."

*Cassidy* is cited with approval by the Court of Appeals in *Hough v. London Express Newspaper, Ltd.*, 3 (1940) All Eng. Rep. 31, a case in which a newspaper said of plaintiff's husband, a noted boxer in England,

"Frank Hough's curly-headed wife sees every fight. 'I should be in more suspense at home,' she says. 'I always get nervous when he gets in the ring, although I know he won't get hurt. Nothing puts him off his food. He always eats a cooked meal last thing at night, however late it is when he gets in.' "

The plaintiff's wife did not have curly hair. She felt that the words imputed to her a meretricious relationship with the boxer and that people would believe from the article that she and Hough were living together out of wedlock.

The court said:

"In these circumstances, it was necessary at the trial to prove by evidence that the matter published in the particular case conveyed to the mind of a normal person cognisant of the special circumstances that which it would not convey

to the mind of a normal person unacquainted therewith. In the present case, the special circumstances which had to be proved were that the plaintiff was the wife of Frank Hough and was known to her acquaintances to have held herself out to be his wife. On this head, there is ample evidence that many of Mrs. Hough's neighbours knew her to be the wife of Frank Hough, and that, when the article appeared, according to the evidence of Mrs. Pitman and Mrs. Meredith, who lived next door to Mrs. Hough, wherever they went they were talking about it, or, to quote Mrs. Pitman 'one or two of the streets were all talking,' and, as Mrs. Meredith said, 'they were all talking about it, one and the other, all looking at the papers and buying them. . . . ' " per Slesser, L.J.

Goddard, L.J., added:

" . . . In the case of words defamatory in their ordinary sense, the plaintiff has to prove no more than that they were published. He cannot call witnesses to prove what they understood by the words. Nor will it avail the defendant to call any number of witnesses to say that they did not believe the imputation. The only question is whether reasonable people might understand them in a defamatory sense. Thus, when circumstances are proved which will clothe with a defamatory meaning words otherwise innocent, the question must equally be whether reasonable people who know the special circumstances might understand them in a defamatory sense. If words which impute discreditable conduct to my friend are used, he has been defamed to me, although I do not believe the imputation, and may even know that it is untrue. . . . "

We said much the same thing in *Purvis v. Bremer's Inc.*, 54 Wn. (2d) 743, 344 P. (2d) 705, as set forth earlier in excerpts from Judge Kelly's memorandum opinion.

We find the Restatement, Torts, likewise in line with this reasoning when it states:

"The meaning of a communication is that which the recipient correctly, or mistakenly but reasonably, understands that it was intended to express." 3 Restatement, Torts § 563.

Nor need special damages be pleaded and proved according to the Restatement:

"One who falsely, and without a privilege to do so, publishes matter defamatory to another in such a manner as to make the publication a libel is liable to the other although no special harm or loss of reputation results therefrom." 3 Restatement, Torts § 569.

We hold then that words published in a daily newspaper concerning such matters as betrothals, marriages, births, divorces and custody of children, if false, may be shown to be libelous by proof of extrinsic circumstances, and may thus become actionable without proof of malice or special damages.

Affirmed.

OTT, C. J., HILL, HUNTER, and HALE, JJ., concur.

