406 So.2d 185 (1981)
Roy B. SCHAEFER, Jr.
v.
Bill LYNCH and the Times Picayune Publishing Corporation.
No. 81-C-1409.
Supreme Court of Louisiana.
November 16, 1981.
*186 Jack M. Weiss, Rutledge C. Clement, Shawn B. Rafferty of Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, F. W. Middleton, Jr. of Taylor, Porter, Brooks & Phillips, Baton Rouge, for defendant-relator.
Robert L. Kleinpeter of Kleinpeter, Kleinpeter & Kleinpeter, Baton Rouge, for plaintiff-respondent.
WATSON, Justice.
The issue in this defamation case is whether defendants are entitled to a summary judgment.
Plaintiff is Roy B. Schaefer, Jr. and defendants are Bill Lynch and the Times Picayune Publishing Corporation. Schaefer alleged that a news article which was printed in the New Orleans States-Item Newspaper was false and defamatory.[1] He also alleged *187 that Bill Lynch wrote the article with the malicious purpose of discrediting Schaefer and effecting his removal as Director of the Louisiana State Employees Retirement System. The States-Item Newspaper, now defunct, was owned by the Times Picayune Publishing Corporation.
Defendants moved for a summary judgment, contending that they had printed no false statements of fact. The trial court denied the motion on the ground that the words, even if true, had a libelous imputation. The First Circuit Court of Appeal declined a writ of review and this court granted one. Schaefer v. Lynch, 401 So.2d 1193 (La.1981).
Summary judgment is designed to dispose of frivolous demands and defenses. It is appropriate only when there is no genuine issue of material fact and mover is entitled to judgment as a matter of law. LSA-C.C.P. art. 966. There is no right to appeal from a court's refusal to render a summary judgment. LSA-C.C.P. art. 968. Official revision comment (d) under that article states:
"Since a trial court's action in overruling a motion for judgment on the pleadings, or for summary judgment, is merely an interlocutory judgment causing no irreparable injury, it cannot be appealed, except under the appeal from the final judgment rendered in the case."
However, a defendant is constitutionally entitled to summary dismissal of a libel suit unless plaintiff can show malice. Batson v. Time, Inc., 298 So.2d 100 (La.App. 1 Cir. 1974), writ denied 299 So.2d 803 (La.). Otherwise, the threat of litigation would have a "chilling" effect on freedom of the press. The writ was granted to determine whether trial on the merits of this libel action would infringe on the rights of freedom of speech and freedom of the press guaranteed under the First and Fourteenth Amendments of the United States Constitution. Batson v. Time, Inc., supra.
Since the news article involves a matter of public interest and a public official, it is governed by the principles enunciated in New York Times Company v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).
Madison v. Bolton, 234 La. 997, 102 So.2d 433 (1958) held that a truthful statement conveying a defamatory insinuation is actionable. Lynch's article conveys the impression that Schaefer used his official position to influence lending institutions for the benefit of his investment in the Beef Corral restaurant. An affidavit by Hazen A. Ross, *188 Jr., indicates that this innuendo was motivated by ill-will. Lynch told Ross "... he would run Roy B. Schaefer, Jr., out of state government if it was the last thing he did."
Schaefer specifically admitted in deposition that, as far as he knew, there was nothing factually incorrect in the article.[2] However, "the way people looked at the thing" he was accused of misusing state funds for personal benefit (Depo. p. 49). Schaefer admitted that, if he had not been honest, he could possibly have manipulated the investments he made in certificates of deposit. However, he said that he tried to avoid even the appearance of wrongdoing. As a result of the article, business at the Beef Corral suffered. The business went bankrupt and Schaefer was left with some of the loan obligations.
There is evidence of malice and ill-will on the part of Lynch. Malice, in the sense of New York Times Co. v. Sullivan, supra, requires publication of falsehoods with knowledge of their falsity or with a reckless disregard of their truth or falsity. Here, there is actual malice but no untruth.
The article is defamatory in the sense that it tends to diminish the public's respect for Schaefer. A defamatory meaning is insinuated. See Cooper v. Greeley, 1 Denio N.Y. Reports 347 (1845).[3] When truthful statements carry a defamatory innuendo, the implication should also be true to justify publication. See Spiegel, "Defamation by ImplicationIn The Confidential Manner", 29 So.Cal.L.Rev. 306. Nonetheless, the publication of true statements is generally encouraged even if published "... for no good reason or for the worst possible motives.... Prosser, Law of Torts, 4th Ed., West, p. 797. The United States Supreme Court has established that there is no liability for publication of the truth about public officials regardless of motive. Garrison v. State of Louisiana, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964). "Truth may not be the subject of either civil or criminal sanctions where discussion of public affairs is concerned." Garrison, supra, 379 U.S. 64, at 74, 85 S.Ct. 209 at 216, 13 L.Ed.2d 125 at 133 (1964). Even a publication which intentionally inflicts harm on a public official is not actionable unless false. Henry v. Collins, 380 U.S. 356, 85 S.Ct. 992, 13 L.Ed.2d 892 (1965).
Madison v. Bolton, supra, correctly held that truthful statements which carry a defamatory implication can be actionable. However, that is only true in the case of private citizens and private affairs. Even false statements about public officials are constitutionally protected unless known to be false or printed with a reckless disregard for the truth. New York Times Company v. Sullivan, supra. It surely follows that all truthful statements are also constitutionally protected. Even though a false implication may be drawn by the public, there is no redress for its servant. Where public officers and public affairs are concerned, there can be no libel by innuendo. The holding of Madison v. Bolton, supra, that a public officer can recover damages for truthful statements containing false and defamatory implications, is overruled. A public official cannot recover damages because a defamatory publication is motivated by ill-will unless the publication is also false. Compare Mihalik v. Duprey, ___ Mass.App. ___, 417 N.E.2d 1238 (1981).
For the foregoing reasons, the judgment of the trial court herein is reversed and the case is remanded for entry of a summary judgment in favor of defendants.
REVERSED AND REMANDED.
CALOGERO, J., concurs.
DENNIS, J., concurs with reasons.
NOTES
[1] The news article was as follows:

"RETIREMENT CHIEF ACKNOWLEDGES LOANS"
"By Bill Lynch
"States-Item bureau
"BATON ROUGERoy Schaefer, director of the State Employees Retirement System, obtained $290,000 in loans, including one unsecured loan, from banks the system did business with, to finance a restaurant in which he was a partner.
"Schaefer acknowledged the loans to The States-Item, but denied there was any impropriety involved.
"He said he paid the going rate of interest on the loans and the retirement system received the maximum benefit on its transactions.
"The veteran state employee said that the entire matter is being investigated by Atty. Gen. William Guste as part of a legislative inquiry into retirement system investment practices.
"Schaefer is a partner in the Beef Corral, a cafeteria-style restaurant in Hammond. He says he owns 42 per cent.
"A $250,000 SMALL Business Administration loan was obtained from the Capital Bank and Trust Co. of Baton Rouge for the Beef Corral, which opened in November, 1974.
"In January, 1974, Schaefer negotiated on behalf of the retirement system an agreement to participate with the Capital Bank and Trust Co. in $1.5 million worth of SBA loans.
"In February, 1975, he obtained an unsecured loan of $15,000 from the First National Bank of St. Bernard Parish for the Beef Corral.
"The retirement system had purchased certificates of deposit from the St. Bernard bank in $2-million increments for 30-day periods during the previous four months.
"A certificate of deposit, or CD, as it is commonly called, is sold by banks as a means of obtaining deposits for a guaranteed period.
"In March, 1975, Schaefer and his original partner, Thomas Demo, obtained a $25,000 loan from the Citizens Bank & Trust Co. of Hammond.
"The retirement system had been purchasing CD's from the bank over a two year period, with as much as $3 million outstanding at one time.
"Schaefer also obtained a $6,000 unsecured loan from the Hibernia National Bank of New Orleans in February, 1975, but the director said the retirement system did not do business with that bank.
"SCHAEFER SAID he had asked the advise (sic) of the attorney for the state Ethics Commission about the propriety of the loans and was advised there was nothing wrong with it because he was paying interest.
"R. Gray Sexton, the attorney for the ethics commission who gave the advice, also was attorney for Schaefer on closing of the SBA loan and was paid $1,300, according to the director.
"Sexton has represented the State Employees Retirement System on a number of real estate loans which have come under scrutiny by a legislative committee and the attorney general's office.
"Schaefer said that his business venture has not fared well and he is faced with possible loss of everything he has. He blamed the problems on cost overruns and high interest rates.
"He said he did not at any time ask for any special treatment because of the retirement system's business dealings with the banks.
"He said he went to the Capital Bank and Trust Co. for the SBA loan because it was doing a lot of SBA business in the state. He said he was charged an 11 per cent interest rate because money was tight at the time.
"The retirement system, Schaefer said, received a good interest rate of 8.75 per cent in its participation agreement on the Capital Bank's SBA loans. He said all of the system's share was guaranteed.
"Schaefer and Demo each put up $12,500 mortgage collateral on their homes for the $25,000 loan from the Citizens Bank of Hammond, he said.
"THE RETIREMENT system bought a $1 million CD from the bank in October, 1973, for a 14-month period. Then it purchased additional CD's during the period, mostly for 30-day periods.
"From September through December of 1974, the system held $3 million in CD's from the Citizens Bank of Hammond.
"Interest rates varied from 11 per cent to 7.6 per cent, but Schaefer said he received the maximum available for the retirement system.
"The $15,000 loan from the St. Bernard bank, he said, was used to pay off an overdraft of $10,000 and insurance of $5,000. He said he only needed to sign his name for a personal loan and did not have to put up any collateral.
"The retirement system bought a $2-million certificate of deposit from the St. Bernard Bank in October, 1974. It was a 30-day CD and was renewed over the next four months.
"Schaefer said that he originally owned 49 per cent and Demo 51 per cent of the Beef Coral stock, but they sold 12½ per cent to a third person.
"He said that with 38 years of state service he is eligible to retire at full salary but has been staying on because he is president of a national organization of retirement system officials.
"Schaefer's name was mentioned prominently in connection with stories a year ago about the retirement system's real estate loans, one of which went into default before the first payment."
[2] Counsel for plaintiff points out that technically Schaefer was a stockholder rather than a partner in the business, but Schaefer himself did not quarrel with his designation as a partner.
[3] The New York Tribune stated, in reference to Cooper's prospective libel action: "He will not like to bring it in New York, for we are known here, nor in Otsego for he is known there." The innuendo that Cooper was in bad repute in Otsego was held to be libelous.