REDMANN, Chief Judge.
Law professors and students every day discuss actual court cases, by name and in detail, for educational purposes. Do they defame a litigant or lawyer by pointing out, so that listeners will avoid similar acts in the future, unwise behavior or procedural missteps in the case?
The question in this appeal from dismissal on the merits of a defamation case is whether a lawyer, while giving an educational address to a group of physicians on how to act in court, defamed a then-unnamed doctor by pointing out that, while testifying as a medical expert in a case involving a femoral arteriogram, the doctor was made to “look bad” by cross-examination that revealed he had never done an arteriogram and did not know the name of the inventor of the procedure or the names of the needles and catheters used in the procedure although a nurse or technician (accustomed to the procedure) would know the instrument names. The particular point being made was that a doctor should avoid testifying out of the field of his expertise, and thus avoid possibly embarrassing cross-examination.
The answer is that the lawyer giving an educational speech to an audience with an interest in the matter, like the law professor, does not defame participants in actual litigation by describing with substantial accuracy the litigation and the acts of the participants that the speaker deems errors that the audience should avoid.
The factual basis for plaintiff’s complaint is that defendant, during the course of an address as general counsel to the Louisiana Medical Society relative to how doctors should act in court, told of a case in which some doctor (in fact that doctor was our plaintiff) qualified as an expert (relative to the standard of medical care in New Orleans) in a medical malpractice case involving a femoral arteriogram procedure. That doctor (in fact our plaintiff) had never done such a procedure and did not know the name of the doctor who invented the procedure, or the needles and catheters used.[1] “[0]f course,” defendant testified at trial, “this made him look bad because he was not familiar with the procedure and he was testifying as an expert on it.”
Plaintiff did have one witness, Dr. Philip M. Castro of Baton Rouge, who testified that in his address (1) defendant identified plaintiff by name as being that doctor; (2) defendant “asked [plaintiff] to identify . .. one particular instrument ... and he [plaintiff] was unable to do that, and later a nurse, I presume a scrub nurse ... was able to identify this instrument”; (3) defendant “didn’t say why he brought [the case and plaintiff’s involvement] up” but Castro’s “impression ... was that this was a clever way to discredit the witness’ testi *12 mony ... [although Castro] didn’t think this was clever on [defendant’s] part, but — I wasn’t too impressed with the impact of the statement.”[2] Defendant and two other doctor witnesses testified, as to (1), that defendant did not identify plaintiff by name, and, as to (3), that the point of referring to that particular case was to impress upon doctors that they ought not to attempt to testify in cases outside of their respective fields. (One other doctor testified he knew enough about the case to infer that plaintiff was the doctor involved, but he believed that inference could not have been drawn by “anybody not familiar with the particular medical-legal scene.”) Defendant further testified, as to Dr. Castro’s point (2), that in addition to a cardiovascular surgeon he did have available at that malpractice trial “a nurse, laboratory technician, whom we did not call but who also knew [the names of the needles and catheters].”
The trial judge found “that the defendant did not make any defamatory or slanderous statements directly or indirectly about the plaintiff.” He added that defendant’s remarks “were educational, informational, and protected by” U.S. Const. Amend. 1 and 14 and La. Const, art. 1 § 7.
Cangelosi v. Schwegmann Bros., 390 So.2d 196, 198 (La. 1980), declares that a successful action in defamation requires a showing of “(1) defamatory words; (2) publication; (3) falsity; (4) malice, actual or implied; and (5) resulting injury.”
Plaintiff argues that defendant’s remarks were defamatory because they tend to expose him to ridicule, Madison v. Bolton, 234 La. 997, 102 So.2d 433 (1958), and that they are presumed to be malicious because they adversely affect his professional reputation, Wiel v. Israel, 42 La.Ann. 955, 8 So. 826 (1890). But the overall evidence here is that no one’s respect for plaintiff was diminished by defendant’s remarks: even Dr. *13 Castro “wasn’t too impressed” because he himself did not know the names of all surgical instruments. We cannot disagree with the trial court’s finding that the words were not defamatory.
Nor can we conclude that the lecture remarks were false, for the transcript from the malpractice trial shows that defendant’s statements, as reported by Dr. Castro, were substantially accurate, and that is all that is required; see Bosley v. Hebert, 385 So.2d 430 (La.App. 1 Cir. 1980).
Moreover, the circumstances and educational intent of the remarks disprove any malice. “The test is the effect the [statement] is fairly calculated to produce and the impression it would naturally engender in the minds of average persons among whom it is intended to circulate.” Brown v. News-World Pub. Corp., 245 So.2d 430, 432 (La.App. 2 Cir. 1971). The overall context of allegedly defamatory statements must be considered, Tate v. Nicholson Pub. Co., 122 La. 472, 47 So. 774 (1908); and the context here shows no design of ill will towards plaintiff but a design to alert the medical audience to stay within their own expertise in court appearances so as to avoid possible embarrassment.
Affirmed.

. That part of our plaintiffs testimony on cross-examination by our defendant in that actual case was: “Q. Have you ever done an arteriogram? A. No, sir. Q. Have you ever done an angiogram? A. No, sir.” Later, “Q. Doctor, what was the name of the man who invented this procedure? A. What procedure? Q. The femoral arteriogram? A. I don’t know. Q. Do you know where it was first done? A. No, sir. I’ve already said I don’t do them, I am not an expert in the procedure, itself. I really doubt if even the people who do them could answer that. Q. Do you know who was the first person who did one in New Orleans? A. No, sir. Q. Do you know what the names of the needles are that they use in this procedure? A. No,' sir. Q. Do you know what the names of the catheters are that they use in this procedure? A. No, sir.”

. Dr. Castro’s téstimony on these points was: “Q. Now, did the name Lloyd Champagne arise during the course of his talk? A. To the best of my ability to recall it was — when this issue came up, this is the thought that came from my mind that I recall in citing the instances that took place in this case in a court hearing he did refer to testimony that was given by a witness — I think he said expert witness — and referred to the witness by name. Q. Did he use the name Dr. Lloyd Champagne as such, or do you recall? A. I recall that he did say Lloyd Champagne. Q. Do you recall whether he mentioned that name in connection with one or more cases? A. In only one case. Q. All right. Now, to the best of your recollection would you repeat what he said in connection with the case that Dr. Champagne was involved in? A. I don’t remember the exact words.... What I recall was that he stated that Dr. Champagne or Lloyd Champagne, I don’t know how he referred to him, was a witness in this case. I think it was a disc case, a back case, surgical case, but I could be wrong about that. But the impression I got was that as a witness he asked him to identify an instrument, one particular instrument — he didn’t say what instrument — and he was unable to do that, and later a nurse, I presume a scrub nurse but I don’t remember whether he qualified this type of nurse, was able to identify this instrument. And in the course of relating what took place during this case hearing, this was sort of a side comment, incidental comment, apparently. He didn’t carry it any further but he just mentioned that as a passing comment. And I guess I recall it because knowing Dr. Champagne and hearing his name it impressed me enough to remember that part whereas I could not give you any details about that case or any ether case.... Q. Did he mention this particular case and Dr. Champagne’s involvement in it to make a particular point? A. I don’t know that. He didn’t say why he brought it up. Q. Can you recall in your mind why you thought he brought it up at the time? ... A. Well, I don’t know what his intention was, but the impression I got was that this was a clever way to discredit the witness’ testimony and like any other legal maneuver that would tend to discredit, it may have been a clever way to do it. Of course, as a physician I didn’t give much thought to this because even though I’ve scrubbed up in a lot of surgical cases there are many instruments that I couldn’t recognize or call by name because I just use them and may not know the name of them. The surgeon would know, but — so I didn’t think this was clever on his part, but — I wasn’t too impressed with the impact of the statement. Q. All right. Is there any doubt of the kind of instrument that Mr. Alsobrook referred to at that particular time and in that particular talk? ... A. If I had to — the best I recall it was a disc case so if it’s a disc case it could be an orthopedic instrument or a neurosurgical instrument.... Q. What else, if anything, did Mr. Alsobrook say in connection with reference to that particular court case that you can recall? A. That’s all I can recall.”